**Bobby TURNAGE d/b/a B & J Mart, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 86–381–CIV–5.**

United States District Court,
E.D. North Carolina,
Raleigh Division.

May 9, 1986.

Bobby G. Abrams, Abrams & Clark, Wilson, N.C., for plaintiff.

Stephen A. West, Asst. U.S. Atty., Raleigh, N.C., for defendant.

JAMES C. FOX, District Judge.

This matter is presently before the court on plaintiff's motion for a temporary restraining order staying the final administrative decision of the Food and Nutrition Service of the United States Department of Agriculture permanently disqualifying him from participation in the Food Stamp Program, pending the outcome of a trial *de novo* before this court.[1] The motion has been thoroughly briefed, and an evidentiary hearing was held thereon on Tuesday, April 29, 1985, in Wilmington, North Carolina, before the undersigned. Accordingly, the motion is now ripe for disposition.

The evidence presented at the hearing demonstrated the following:

Plaintiff, Bobby Turnage, owner and operator of B & J Mart, a retail grocery and gasoline business located in Wilson, North Carolina,[2] applied to participate in the food stamp program on September 24, 1981. On his application, Mr. Turnage identified himself as the owner and person responsible for the overall operation of B & J Mart and, by his signature on the application, certified that he had read and understood the regulations governing the food stamp program, that his firm and all employees would comply with the regulations, that he understood his authorization to participate in the program could be revoked for any violations by firm employees, and that all the information on the application was true. Turnage also indicated on his application that he sold gasoline and alcoholic beverages at his store as well as food, and he estimated that for the past year his food sales had constituted approximately 34% of his gross sales. The application was approved and Turnage was authorized to participate in the food stamp program on October 15, 1981.

During the approximately 1½ years following Turnage's authorization, the Food and Nutrition Service ("FNS") received three separate complaints that employees of B & J Mart were discounting and purchasing food stamp coupons and/or accepting food stamps in exchange for non-eligible items such as alcoholic beverages and cigarettes. After the first complaint, made on April 6, 1982, a FNS representative,

---

1. Because plaintiff requests a stay pending the outcome of a trial *de novo,* the court shall treat the motion as one for a preliminary injunction.

2. B & J Mart is located in a low-income, predominantly black section of Wilson. Located in the same vicinity are the Department of Social Services, low-income housing, and a housing facility for the elderly and the handicapped. Individuals living in these facilities patronize the B & J Mart. Within two blocks of the B & J Mart, however, are two grocery stores which participate in the food stamp program, and which also serve these individuals, or have the capacity to do so.

Teresa Anderson, telephoned the firm and spoke to Jimmy Turnage, who identified himself as a co-owner along with his father Bobby Turnage. Ms. Anderson discussed the complaint with Turnage, reviewed the applicable food stamp regulations with him, and warned him of the possibility of disqualification. Jimmy Turnage indicated that he understood the regulations, but denied any knowledge of the complaint. A letter confirming the details of this conversation was sent on April 20, 1982, and received by the owner, Bobby Turnage. Subsequently, two additional complaints were received by FNS on November 19, 1982, and January 17, 1983.

Because of this history of complaints against the firm and the perception that the firm was redeeming a high percentage of food coupons, a FNS representative, Shepard Shultz, visited the firm on January 18, 1983. Once again, he reviewed the regulations and discussed the complaints with Jimmy Turnage.

As a result of the complaints, a request for investigation was made by FNS on January 25, 1983, and investigator Harvey Knowles initiated an investigation of B & J Mart in May of 1983. Knowles employed locally two female aids who, while under his supervision,[3] separately visited the store on May 24, 1983, and May 27, 1983; in addition, one of the aids visited the store again on June 1, 1983. Mr. Knowles testified that on four of these visits, the clerk in the store, later identified as Jimmy Turnage, sold the aids a total of 25 ineligible items in exchange for food stamps. On one visit, Knowles stated that Turnage accepted $50 worth of food coupons in exchange for $30 in cash. The aids employed

by Mr. Knowles, however, did not testify at the hearing.

On or about July 25, 1985, Bobby Turnage was notified by letter of the investigation of B & J Mart, and charged with the five separate violations referred to above. Each of the five aforementioned violations were described in detail therein. The letter indicated to the plaintiff that his store was being considered for disqualification from the Food Stamp Program, and therefore plaintiff was encouraged to give administrative officials any information, explanation, or evidence he had regarding these charges within ten days of the receipt of the letter. Plaintiff was given an opportunity to respond in writing or in person. Turnage replied to the letter in writing on July 30, 1985. After a review of the evidence and Turnage's reply, an agency determination was issued on December 10, 1985, which found that Bobby Turnage or one of his employees had violated the regulations governing the food stamp program, and B & J Mart was permanently disqualified from participation in the food stamp program, and fined the sum of $104.56 for submission of false claims to the government.[4] Plaintiff was given ten days within which to submit a timely request for review; by doing so, the agency determination would be stayed pending a decision by the Food Stamp Review Officer. On December 16, 1985, Bobby Turnage submitted a timely request for review of the administrative determination. By letter dated December 26, 1985, Administrative Review Officer Priscilla Shaw requested plaintiff to furnish a statement outlining his reasons for requesting a review, and opposing the proposed disqualification, and gave plain-

---

3. On each occasion when an aid visited the store, Mr. Knowles accompanied her but remained in his car in the store parking lot or a nearby bus station parking lot. Before entering the store, Mr. Knowles required each aid to surrender to him all monies or food coupons, if any, which she might have in her possession, gave her food coupons with which to attempt to make unauthorized purchases, and watched her enter the store. Upon exiting the store, he retrieved from her any cash, food coupons, and food and/or non-food items purchased, and prepared a transaction report which she then

signed. Copies of each of the transaction reports for the five separate visits are attached to Mr. Knowles' affidavit, which accompanies the government's memorandum filed April 21, 1986.

4. Pursuant to 7 U.S.C. § 2021(b)(3), disqualification "shall be ... permanent upon ... the first occasion of a disqualification based on the purchase of coupons or trafficking in coupons...." "Trafficking" is defined in 7 C.F.R. § 271.2 as the "buying or selling of coupons ... for cash."

tiff an opportunity to furnish any additional information. Because plaintiff had requested a meeting in his December 10 letter, Ms. Shaw noted that she would arrange a date and place. In response to this request, plaintiff submitted a letter on January 10, 1986, simply stating that he had done nothing wrong. By letter dated February 4, 1986, Ms. Shaw wrote plaintiff and informed him that the meeting would have to take place in Alexandria, Virginia, or via telephone conference. Alternatively, plaintiff was asked to submit any additional information in writing. A telephone conference was subsequently held.

On February 25, 1986, a final agency decision was issued sustaining the initial decision disqualifying B & J Mart from participation in the food stamp program. Also sustained was the initial determination charging Turnage with the irregular handling of food stamps resulting in a false claim of $104.56. Turnage was informed that the period of disqualification would begin thirty days after receipt of the letter. Turnage received the letter on March 3, 1986, and subsequently timely filed the instant lawsuit for judicial review of the agency determination. On April 10, 1986, counsel agreed to a temporary stay of the administrative disqualification pending a final determination by the court as to whether a stay is warranted.

In order to obtain a stay of the disqualification pending *de novo* review, plaintiff must demonstrate both "irreparable injury," and his "likelihood of prevailing on the merits." 7 U.S.C. § 2023(a). Specifically, the statute provides in pertinent part that:

during the pendency of such judicial review ... the administrative action under review shall be and remain in full force and effect, unless on application to the court ..., and after hearing thereon and a consideration by the court of the applicant's likelihood of prevailing on the merits and of irreparable injury, the court

temporarily stays such administrative action pending disposition of such trial.... 7 U.S.C. § 2023(a). The court will address these requirements separately.

First, Plaintiff alleges that the disqualification of his business from the food stamp program would cause it irreparable injury in that a sizeable portion of his retail business would be eliminated, causing the business to close. Plaintiff's financial records indicate that over the last six months, B & J Mart has been operating at a net loss. The net loss and food stamp/WIC receipts (a North Carolina program for women with infants and children tied to the federal food stamp program) for the months October, 1985 through March, 1986 are as follows:

| | Net Loss | Food Stamp/WIC Receipts |
|---|---|---|
| October, 1985 | $ 961.87 | $2,484.83 |
| November, 1985 | 43.46 | 1,965.01 |
| December, 1985 | 1,038.43 | 1,796.73 |
| January, 1986 | 595.08 | 1,405.02 |
| February, 1986 | 442.08 | 1,700.24 |
| March, 1986 | 68.04 | 1,788.54 |

Plaintiff, although operating at a net loss, has been able to keep the B & J Mart afloat through rental income and a charter bus business which he runs from the office located above the B & J Mart. As evidenced from the above, however, a loss to the plaintiff of the food stamp/WIC receipts may very likely force the plaintiff to close his business.

"To be sure, an endurable deprivation of modest revenues during the pendency of judicial review might not amount to irredeemable harm." *Dellavalle v. United States Department of Agriculture,* 619 F.Supp. 1297, 1304 (D.R.I.1985). The case at bar, however, "presents a compelling picture of the prospect of irreparable harm." *Id.* In this instance, as in *Dellavalle,*[5] the result of a suspension is likely to be severely damaging in that B & J Mart may well be forced to close its doors; B & J Mart's customers, however, do have convenient shopping alternatives. This court

**5.** In *Dellavalle,* the plaintiff alleged that his store was located in a low-income neighborhood and that between 90% to 95% of its business emanated from food stamp households; the

court found that such a case presented "a compelling picture of irreparable harm." 619 F.Supp. at 1304.

does not agree with the court in *Gurtzweiler v. United States*, 601 F.Supp. 883, 885 (N.D.Ohio 1985), wherein the court stated that 7 U.S.C. § 2023 contemplates that the plaintiff make a showing of something beyond the customary economic loss of food stamp business to prove irreparable harm. In the case at bar, it is clear that the loss of the food stamp business to B & J Mart may result in its closure. Such result clearly can be classified as irreparable harm.

Because of a modification in the statute, this court must also consider plaintiff's likelihood of prevailing on the merits; unlike the courts' inquiry in *Dellavalle* and *Gurtzweiler*, referred to above, this court cannot cease its inquiry with a determination as to irreparable harm. The statute now requires a plaintiff to demonstrate *both* his likelihood of prevailing on the merits and irreparable injury in order to obtain a stay of the disqualification pending *de novo* review.

 Although the plaintiff succeeds in showing irreparable injury, he has failed to demonstrate a likelihood of prevailing on the merits. The government's evidence is rebutted only by Bobby and Jimmy Turnage's categorical denials of the conduct with which they are charged. In light of Mr. Knowles' testimony, and the anticipated trial testimony of his two aids, plaintiff is unlikely to be able to demonstrate that the four instances of unauthorized sales and one instance of trafficking food stamps did not occur. Therefore, pursuant to 7 U.S.C. § 2023(a), plaintiff is not entitled to obtain a stay of his disqualification pending *de novo* review.

 Plaintiff argues, however, that even if the court perceives plaintiff's likelihood of success on the merits to be slim, it must grant the stay because enforcement of the administrative decision at this juncture would deprive plaintiff of a property right without procedural due process protections. In support of this contention,

plaintiff points to the Fourth Circuit decision in *Cross v. United States*, 512 F.2d 1212 (4th Cir.1975).

In *Cross*, the Fourth Circuit held that a retail grocery store proprietor could not be deprived of participation in the food stamp program without being afforded procedural due process protections as to *both* the administrative determination of a violation of the statute, *and* the administrative sanction imposed. *Id.* at 1216. Prior to this decision, the district courts in the Fourth Circuit lacked the power to go beyond the issue of the validity of the disqualification action and modify the administrative sanction. *See Welch v. United States*, 464 F.2d 682 (4th Cir.1972). The court in *Cross* found that due process required the district court to be able to review the sanction as well, since the only true hearing allowed by the statute is in the district court.[6] *Cross*, 512 F.2d at 1217. In order to preserve the regulatory scheme from constitutional attack, the court determined that full procedural due process protections ultimately must be made available in the district court as to both issues. *Id.* If due process is accorded to both issues, the court impliedly stated that the regulatory scheme remains safe from a constitutional attack. Because "due process is flexible and calls for such procedural protections as the particular situation demands," however, *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), the court will resolve the issue of whether the administrative procedures provided herein were constitutionally sufficient. Such a determination requires an analysis of the governmental and private interests that are affected. *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976).

As the Supreme Court indicated in *Mathews v. `Eldridge, supra*, identification of the specific dictates of due process generally requires consideration of three distinct factors:

First, the private interest that will be affected by the official action; second,

---

6. At the administrative level, there is no confrontation with accusors, no opportunity to cross-examine and to test credibility, and no

determination by an impartial factfinder. *Cross*, 512 F.2d at 1216.

the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.* at 335, 96 S.Ct. at 903.

The court will address these factors *seriatim.*

In assessing the private interest that will be affected by the official action—that is plaintiff's permanent disqualification from participation in the food stamp program— the degree of potential deprivation is an important consideration. "[T]he possible length of wrongful deprivation of ... benefits is an important factor in assessing the impact of official action on the private interests." *Fusari v. Steinberg,* 419 U.S. 379, 389, 95 S.Ct. 533, 540, 42 L.Ed.2d 521 (1975). Although plaintiff has been permanently disqualified from participation in the program, this decision is subject to *de novo* review by this court; this action has been set for trial during this court's June 9, 1986, trial calendar, and therefore the possible length of a wrongful deprivation of participation in the program would extend only from the date of this court's decision to the time of trial—a period of approximately one month. Therefore, the degree of potential deprivation in this case is a loss of plaintiff's food stamp business for an approximate period of one month; this loss, however, might require plaintiff to reestablish his food stamp business should this court ultimately decide the issue in his favor.

Another important consideration in assessing the private interest that will be affected by the official action is the plaintiff's potential sources of temporary income during the period of deprivation. In the case at bar, disqualification from the food stamp program would not deprive the plaintiff of the very means by which he lives. Although food stamp receipts comprise a substantial portion of his business, which has been suffering net losses for the past six months, plaintiff receives income from a bus service which he runs, as well as rental income in the amount of $200 per month.[7]

The court must next assess the fairness and reliability of the existing pre-termination procedures, and the probable value, if any, of additional procedural safeguards. In the case at bar, as in *Goldberg,* a wide variety of information may be relevant and issues of witness credibility and veracity are critical to the decision-making process. In the case at bar, unlike in *Goldberg,* the plaintiff had an opportunity to orally present his position to administrative officials.[8] Further, in the case at bar, as in *Goldberg,* the plaintiff was allowed to tender written submissions. People in plaintiff's position are *storeowners,* however, requiring a higher level of intelligence than the plaintiff in *Goldberg,* wherein written submissions were viewed as an unrealistic option because most welfare recipients like the plaintiff lacked the educational attainment necessary to write effectively, and could not afford professional assistance. Such is not the case herein. The process afforded the plaintiff before his termination herein provided him with access to information about the instances of misconduct with which he was charged, as well as an opportunity to rebut these charges.

Finally, the court must consider the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, an evidentiary hearing upon demand in all cases prior to the disqualification from partic-

---

7. Only in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), has the Supreme Court held that due process requires an evidentiary hearing prior to a temporary deprivation. *Goldberg* involved a termination of welfare benefits, which would deprive the plaintiff therein of the very means by which he lived.

The potential deprivation in the case at bar is likely to be less than that in *Goldberg.*

8. In *Goldberg,* a termination of welfare benefits lacked procedures which gave the welfare recipient an opportunity to personally appear or orally present evidence on his behalf.

ipation in the food stamp program. As the court stated in *Mathews v. Eldridge,*

"[t]he most visible burden would be the incremental costs resulting from the increased number of hearings.... The fact that full benefits would continue until after such hearings would assure the exhaustion in most cases of this attractive option.... Experience with the constitutionalizing of government procedures suggests that the ultimate additional cost in terms of money and administrative burden would not be insubstantial." 424 U.S. at 347, 96 S.Ct. at 909.

Although financial cost alone is not controlling, the government's interest and hence that of the public, in conserving fiscal and administrative resources is a factor that must be weighed. *Id.* at 348, 96 S.Ct at 909. "At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost." *Id.* Furthermore,

"[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decision making in all circumstances. The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and an opportunity to meet it'.... All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' ... to insure that they are given a meaningful opportunity to present their case." *Id.* at 348–349, 96 S.Ct. at 909–10 (citations omitted).

The court finds that the procedures employed at the administrative level gave the plaintiff this meaningful opportunity to present his case. The prescribed procedures provided the plaintiff with an effective process for asserting his claim prior to the administrative action; in addition, plaintiff was given an opportunity to orally present his contentions, either in person or telephonically. Furthermore, plaintiff was entitled to subsequent judicial review, a procedure which he is now utilizing, before

his permanent disqualification from the food stamp program becomes final. "In assessing what process is due in this case, substantial weight must be given to the good-faith judgments of the individuals charged by Congress with the administration of social welfare programs that the procedures that they have provided assure fair consideration of the entitlement claims of individuals." *Id.* at 319, 96 S.Ct at 895 (citations omitted).

Therefore, for the reasons stated hereinbefore, this court concludes that an evidentiary hearing is not required prior to a permanent disqualification from participation in the food stamp program, and that the present administrative procedures fully comport with due process. Therefore, plaintiff's motion for a temporary injunction staying the final administrative decision of the Food and Nutrition Service of the United States Department of Agriculture is hereby DENIED. The parties should note that this action is set for trial during this court's June 9, 1986, trial term.

SO ORDERED.