MOSES H. CONE MEMORIAL HEALTH SERVICES CORP. D/B/A LeBAUER HEALTH CARE, Plaintiff v. PATRICIA F. TRIPLETT, M.D., Defendant

No. COA03-1604

(Filed 7 December 2004)

**1. Employer and Employee— wages—change in bonus formula**

The trial court did not err by failing to award liquidated damages to defendant doctor based on plaintiff healthcare provider's alleged violation of the North Carolina Wage and Hour Act under N.C.G.S. § 95-25.13(3) resulting from a change in plaintiff's bonus formula, because: (1) defendant's bonus had not accrued at the time of the change when under the pertinent contract, the amount to which any member of the primary care provision was entitled to as a bonus was not calculable until the end of the plan year;

**MOSES H. CONE MEM'L HEALTH SERVS. CORP. v. TRIPLETT**

[167 N.C. App. 267 (2004)]

and (2) defendant's changes only affected those benefits accruing after written notice was given the employee or notice was posted in a place accessible to the employees.

**2. Damages and Remedies— breach of covenant not to compete—measure of damages—lost profits**

The trial court erred by awarding plaintiff healthcare provider $53,340.16 in damages and restitution for defendant doctor's violation of the parties' contract involving a covenant not to compete which was the amount plaintiff paid defendant over the course of defendant's employment as covenant payments and by alternatively granting summary judgment on plaintiff's unjust enrichment claim when there was in fact a breach of contract, and the case is remanded for further proceedings on the issue of damages, because: (1) the amount was an improper measure of damages since plaintiff would not have been entitled to receive back any money paid for the covenant not to compete if the contract had been performed; and (2) in breach of covenant not to compete claims, the usual measure of damages is lost profits.

**3. Appeal and Error— preservation of issues—failure to argue**

The assignments of error that defendant failed to present in her brief are deemed abandoned pursuant to N.C. R. App. P. 28(b)(6).

Appeal by plaintiff and defendant from judgment entered 23 June 2003 by Judge John O. Craig, III, in Guilford County Superior Court. Heard in the Court of Appeals 21 September 2004.

*Smith Moore LLP, by Julie C. Theall and Alexander L. Maultsby, for plaintiff-appellant and -appellee.*

*John J. Korzen for defendant-appellant and -appellee.*

THORNBURG, Judge.

Defendant was hired by LeBauer Health Care, P.A., in August 1996. On 1 February 1999, Moses H. Cone Health Services Corp. (the "System") acquired LeBauer Health Care and formed plaintiff ("LeBauer") in this action. Defendant entered into an employment contract with LeBauer on that date for a term of ten years. Defendant worked in the Primary Care division of LeBauer. However, defendant spent most of her time in the hospital caring for LeBauer's patients

that were receiving hospital care, as opposed to caring for patients at LeBauer's offices.

The employment contract consisted of three main documents: the Employment Agreement (the "agreement") and two exhibits, the Physician Compensation Plan (the "compensation plan") and the Allocation Model (the "allocation model"), along with several other exhibits. The agreement set forth the details of the employment and included a covenant not to compete. The compensation plan detailed how LeBauer would receive compensation from the System. The allocation model described how compensation would be allocated among the divisions of LeBauer and how the divisions would compensate the individual physicians. Further details of the contract will be discussed herein as necessary.

On or about 6 August 2001, defendant resigned from her employment with LeBauer. On 4 September 2001, defendant began working for Cornerstone Health Care in High Point, North Carolina. On 15 October 2001, LeBauer filed a complaint alleging that defendant was engaged in the practice of medicine in direct competition with LeBauer in the restricted area during the restricted period contained in the covenant not to compete of defendant's contract with LeBauer. LeBauer alleged: (1) breach of contract, asking for damages, specific performance and/or injunctive relief; (2) misrepresentation by defendant as to her intent to perform under the contract; (3) unjust enrichment for accepting compensation for the covenant; and (4) rescission of the contract. On 19 November 2001, defendant answered LeBauer's complaint and counterclaimed alleging breach of contract and a violation of the North Carolina Wage and Hour Act ("Wage and Hour Act"), N.C. Gen. Stat. § 95-25.1 et seq. (2003).

Both parties moved for summary judgment in January 2003. On 23 June 2003, the trial court ordered that each party's motion should be allowed in part and denied in part. The trial court granted summary judgment to LeBauer as to its claims for breach of contract, misrepresentation and, alternatively, as to unjust enrichment. The trial court awarded LeBauer $53,340.16, the amount paid by LeBauer to defendant in exchange for the covenant not to compete, in damages or, alternatively, as restitution. The trial court denied LeBauer's motion as to its claim for injunctive relief. Defendant's motion on her counterclaim pursuant to the Wage and Hour Act was allowed, though the trial court chose not to award liquidated damages for the violation. All of defendant's remaining claims were dismissed pursuant to summary judgment.

Both parties appeal from this judgment. Defendant argues on appeal: (1) that the trial court erred in failing to award liquidated damages for the violation of the Wage and Hour Act and (2) that the trial court erred in awarding LeBauer $53,340.16 in damages or restitution. LeBauer argues on appeal that the trial court erred in finding a violation of the Wage and Hour Act.

## North Carolina Wage and Hour Act claim

[1] Defendant's Wage and Hour Act claim is based upon a change to the allocation model that occurred in December 1999 during her first year of employment under the contract.

Compensation was addressed in section eight (8) of the agreement. The agreement provides:

> For all services rendered by Physician during the term hereof, Physician shall receive compensation and fringe benefits in accordance with the Physicians' Compensation Plan (the "Compensation Plan"), a copy of which is attached hereto as Exhibit B, and the Allocation Model adopted pursuant to the Compensation Plan.

The allocation model:

> [S]ets forth the procedure by which payments to the Group [LeBauer] by the System pursuant to the Physicians Compensation Plan (the "Compensation Plan") are allocated to the specialty practice areas within the Group (individually, a "Division" and collectively, the "Divisions") and paid to the individual physicians and other professional staff within the Divisions.

Article II of the compensation plan provides that compensation is to be divided into divisional compensation pools, special allocations and the compensation incentive pool, with each division allocated a set amount for base compensation. The Primary Care division allocated base compensation for its physicians according to professional productivity for the immediately preceding year and also established a Primary Care Bonus Pool ("bonus pool"). The bonus pool was to be "[t]he excess, if any, of the Divisional Compensation Pool over aggregate Base Compensation" and would be divided among the primary care physicians in part based on professional productivity.

The initial divisional compensation pool for each division was established and detailed in an exhibit to the compensation plan. The

initial divisional compensation pool provided the Primary Care division with a compensation pool of $3,120,000, including $203,375 labeled as "Incentive Pool." We first note that included in the compensation plan was a provision for "Incentive Compensation." Incentive Compensation was defined as "fifteen percent (15%) of the amount by which actual Gross Revenue for such year exceeds the Target Gross Revenue for such year." As the allocation model provides that Incentive Compensation, at least initially, would be allocated among the divisions, we conclude that though labeled "Incentive Pool," the $203,375 was in fact for the bonus pool. Accordingly, although by definition whether there is a bonus pool would generally be speculative, it appears that for the initial year there was a set sum established for the bonus pool.

The original allocation model provides that twenty-five percent (25%) of the bonus pool was to be allocated to members of the division who performed administrative duties that did not generate professional charges. The remaining seventy-five percent (75%) was to be allocated among the full-time members of the division. The original allocation model set forth the following formula for calculating the amount each member would receive:

a. Multiply Professional Productivity for each member by 0.4, and then subtract therefrom the Base Compensation allocated to such member;

b. Aggregate the result in step 'a' for all members for whom the result in step 'a' is greater than zero (the "Bonus Recipients");

c. For each Bonus Recipient, divide the result in step 'a' by the aggregate amount determined in step 'b';

d. Allocate to each Bonus Recipient an amount equal to the percentage result in step 'c' multiplied by the Primary Care Bonus Pool.

Basically, the bonus pool was to be distributed based on a member's comparative Professional Productivity. Professional Productivity is defined in the allocation model as "the professional services component of charges for services rendered by a physician based on CPT Codes as utilized from time to time by the Health Care Financing Administration ("HCFA")." The contract goes on to say that Professional Productivity is calculated on the last day of the sixth month and the last day of the twelfth month of each Plan year, in the "Semi-Annual Allocation Periods." However, the bonus pool alloca-

tions are exempted from the semi-annual allocation periods, leaving professional productivity for the purposes of the bonus pool to be calculated at the end of each plan year. Thus, the final amount that defendant might be entitled to as a bonus was not calculable until the end of the plan year.

Sometime in the fall of 1999, it was discovered that, due to the fact that hospital charges were higher than charges for similar services performed in the office, defendant was projected to earn a disproportionately large share of the bonus pool. After negotiating with defendant and discussing the issue with other members of the Primary Care division, the allocation model was amended by reducing all hospital charges by fifteen percent (15%) and paying defendant a one-time raise in base compensation. The net result of these changes was that defendant received in total compensation a smaller amount than she would have received under the original allocation model's formula.

N.C. Gen. Stat. § 95-25.13, a provision of the Wage and Hour Act, provides in pertinent part:

Every employer shall:

. . . .

(3) Notify its employees, in writing or through a posted notice maintained in a place accessible to its employees, of any changes in promised wages prior to the time of such changes except that wages may be retroactively increased without the prior notice required by this subsection . . . .

N.C. Gen. Stat. § 95-25.13(3) (2003).

The Wage and Hour Act defines the term "wage" to include such wage-related benefits as "sick pay, vacation pay, severance pay, commissions, *bonuses*, and other amounts promised when the employer has a policy or a practice of making such payments." N.C. Gen. Stat. § 95-25.2(16) (2003) (emphasis added).

In interpreting N.C. Gen. Stat. § 95-25.13(3), this Court has said:

Once the employee has earned the wages and benefits under this statutory scheme, the employer is prevented from rescinding them, with the exception that for certain benefits such as commissions, bonuses and vacation pay, an employer can cause a loss or forfeiture of such pay if he has notified the employee of

**MOSES H. CONE MEM'L HEALTH SERVS. CORP. v. TRIPLETT**

[167 N.C. App. 267 (2004)]

the conditions for loss or forfeiture in advance of the time when the pay is earned.

*Narron v. Hardee's Food Systems, Inc.*, 75 N.C. App. 579, 583, 331 S.E.2d 205, 208, *disc. review denied*, 314 N.C. 542, 335 S.E.2d 316 (1985). Thus, "[w]e have construed this statute to permit an employer to make changes in an employee's benefits, but the change applies only to those benefits *accruing* after written notice is given the employee or notice is posted in a place accessible to the employees." *McCullough v. Branch Banking & Tr. Co.*, 136 N.C. App. 340, 349, 524 S.E.2d 569, 575 (2000) (citing *Narron*, 75 N.C. App. at 583, 331 S.E.2d at 207-08) (emphasis added). Accordingly, whether LeBauer's change to the bonus formula constitutes a violation of N.C. Gen. Stat. § 95-25.13 depends upon whether defendant's bonus had accrued at the time of the change.

We conclude that defendant's bonus had not accrued at the time of the change and, thus, there was no violation of N.C. Gen. Stat. § 95-25.13(3). Under this contract, the amount to which any member of the Primary Care division was entitled to as a bonus was not calculable until the end of the plan year. Thus, no definite sum had accrued to defendant at the time the change was made.

Defendant argues that *Murphy v. First Union Capital Mkts. Corp.*, 152 N.C. App. 205, 567 S.E.2d 189 (2002), and *McCullough*, each of which address N.C. Gen. Stat. § 95-25.13(3), control in this matter and establish a violation of the Wage and Hour Act in this case. However, *Murphy* decided that a bonus consisting partly of non-vested stock was a wage and that there had been no violation of the Wage and Hour Act because the employee had been properly notified. *Murphy*, 152 N.C. App. at 208-09, 567 S.E.2d at 192-93. *McCullough* only concluded that a bonus was a wage and that, as the employee's contract did not address the forfeiting of a bonus upon termination, requiring forfeiture was not a change to the employee's wage. *McCullough*, 136 N.C. App. at 350, 524 S.E.2d at 575. Neither case discussed whether a bonus that could not be quantified at the time of the change had accrued at the time the change was made.

In the instant case, a quantifiable bonus had not accrued at the time that LeBauer implemented the change to the bonus plan. In accordance with *Murphy*, *McCullough* and *Narron*, we conclude that, as defendant's bonus was not quantifiable, it had not accrued at the time of the change and, thus, there was no violation of N.C. Gen. Stat. § 95-25.13(3). LeBauer's change only affected those "benefits *accru-*

*ing* after written notice is given the employee or notice is posted in a place accessible to the employees." *McCullough,* 136 N.C. App. at 349, 524 S.E.2d at 575 (emphasis added).

We reverse and remand this issue to the trial court. Due to our conclusion on this issue, we do not address defendant's argument that she should have been awarded liquidated damages for a Wage and Hour Act violation pursuant to N.C. Gen. Stat. § 95-25.22(a1).

## Damages for the Breach of the Covenant Not to Compete

[2] Defendant's contract with LeBauer included a covenant not to compete. Defendant was paid bi-weekly a discrete sum in return for her agreement to the covenant. Over the course of defendant's employment with LeBauer she was paid $53,340.16 as covenant payments. The covenant restricted defendant from practicing medicine while employed by LeBauer, and for two years after her termination, if terminated within the first five years of the contract, in Alamance, Forsyth (excepting the city of Winston-Salem), Guilford, Randolph and Rockingham Counties. The trial court ordered defendant to pay LeBauer "damages in the amount of $53,340.16, which the Court concludes, based on the uncontroverted evidence, was the amount paid by [LeBauer] to defendant in exchange for the covenant." The same amount was alternatively awarded as restitution.

Restrictive covenants between an employer and employee are valid and enforceable if they are (1) in writing, (2) made part of a contract of employment, (3) based on valuable consideration, (4) reasonable both as to time and territory, and (5) not against public policy. *See A.E.P. Industries v. McClure,* 308 N.C. 393, 402-03, 302 S.E.2d 754, 760 (1983); *United Laboratories, Inc. v. Kuykendall,* 322 N.C. 643, 649-50, 370 S.E.2d 375, 380 (1988). The parties do not argue that the covenant not to compete was invalid. Further, as defendant practiced medicine in Guilford County during the restricted period, the trial court was correct to conclude that the covenant not to compete had been violated and that defendant breached the employment contract. As we conclude that there was in fact a breach of contract, it was improper for the trial court to alternatively grant summary judgment on LeBauer's unjust enrichment claim.

Defendant argues that the damages awarded LeBauer were inappropriate. We agree as to the amount awarded, but find disingenuous defendant's argument that LeBauer is not entitled to money damages because her breach did not occur while she was employed by

LeBauer. Certainly, any breach that has already occurred, whether while defendant was employed or after she was terminated, would necessarily be in the past when the suit was filed.

The agreement provides in paragraph 23:

> In the event of a breach or threatened breach of the provisions of the covenants against competition set forth herein, the LeBauer Practice shall have the cumulative right to seek monetary damages for any past breach and equitable relief, including specific performance by means of an injunction against Physician or against Physician's partners, agents, representatives, servants, corporations, employees, and/or any persons acting directly or indirectly by or with Physician, to prevent or restrain any such breach.

Clearly, the parties anticipated the possibility of money damages in the event of a breach of the covenant not to compete, though they chose not to include a liquidated damages clause.

In determining damages for a breach of contract, this Court has said:

> For a breach of contract the injured party is entitled as compensation therefore to be placed, insofar as this can be done by money, in the same position he would have occupied if the contract had been performed. Additionally, nominal damages are allowed where a legal right has been invaded but there has been no substantial loss or injury to be compensated.

*Lee Cycle Ctr., Inc. v. Wilson Cycle Ctr., Inc.*, 143 N.C. App. 1, 9-10, 545 S.E.2d 745, 750 (2001) (internal citations omitted). As LeBauer would not have been entitled to receive back any money paid for the covenant not to compete if the contract had been performed, we conclude that this was an improper measure of damages. In breach of covenant not to compete claims, the usual measure of damages is lost profits. *See Keith v. Day*, 81 N.C. App. 185, 195-97, 343 S.E.2d 562, 568-69 (1986). Accordingly, we reverse the trial court's award of damages and remand to the trial court for further proceedings on the issue of damages.

**[3]** Defendant presented six assignments of error on appeal. However, defendant has only presented four of those assignments in her brief. Defendant failed to set out her remaining assignments of error in her brief. Because she has neither cited any authority nor

stated any reason or argument in support of those assignments of error, they are deemed abandoned. N.C. R. App. P. 28(b)(6).

Reversed and remanded.

Judges WYNN and McCULLOUGH concur.