**SOUTHTECH ORTHOPEDICS, INC., Plaintiff,**

v.

**Corey DINGUS, Defendant.**

**No. 5:05–CV–626FL3.**

United States District Court, E.D. North Carolina, Western Division.

March 27, 2006.

John N. Hutson, Jr., Howard Stallings From & Hutson, PA, Raleigh, NC, for Plaintiff and Counter Defendant.

James Michael Honeycutt, Shannon Sumerell Spainhour, Fisher & Phillips, LLP, Charlotte, NC, for Defendant and Counter Claimant.

## ORDER

FLANAGAN, Chief Judge.

This case comes now before the court on plaintiff's motion for a preliminary injunction (DE # 5) to enforce specifically the terms of a covenant not to compete. The parties conducted expedited discovery, the issues presented have been fully briefed, hearing was held on February 27, 2006, and in this posture the motion is ripe for adjudication. For the following reasons, plaintiff's motion is denied.

## STATEMENT OF THE CASE

Plaintiff SouthTech Orthopedics, Inc. ("plaintiff" or "SouthTech") filed this complaint in the Wake County Superior Court on August 11, 2005, asserting against defendant a claim for breach of a covenant not to compete contained in an employment contract and a claim for unfair and deceptive trade practices pursuant to N.C. Gen.Stat. § 75–1 et seq. Plaintiff initially sought a temporary restraining order in addition to preliminary and permanent injunctive relief, however plaintiff agreed to forego his TRO application in exchange for expedited discovery and hearing on the motion for preliminary injunction. On September 15, 2005, defendant removed the case to federal court on the basis of diversity of citizenship.

Decision on the motion for preliminary injunction was ultimately delayed, however, due to the need of three district judges to recuse themselves from this matter. The case was not ultimately reassigned to the undersigned district judge until January 27, 2006. A Rule 16(a) status conference was held on February 15, 2006, at which time counsel indicated a preference for a non-evidentiary hearing on the motion. Accordingly, the court set the motion for hearing on February 27, 2006, ruled on the pending motions to seal, and at the conclusion of arguments took the motion for preliminary injunction under advisement.

For the sole purpose of the motion now under consideration, the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Plaintiff is a North Carolina corporation with its principal place of business located in Raleigh, North Carolina. The principals of SouthTech are Messrs. William Player Barefoot and Jeffrey Hughes. SouthTech is a distributorship of medical and surgical devices related to sports and orthopedic medicine, representing various manufacturers of these products (including, as is relevant to the present litigation, Arthrex, Inc. ("Arthrex"), and, through April 2005, ArthroCare Corp. ("Arthro-Care")) in the territory encompassing North Carolina, South Carolina, and portions of Virginia.

2. Defendant is a resident of South Carolina and principal of Procore Medical, LLC ("Procore"). Defendant was employed by plaintiff for approximately five and a half years, after which time he resigned to start his own distributorship. Defendant, through Procore, is now the exclusive distributor for ArthroCare in the territory encompassing the state of South Carolina.

3. On defendant's first day of work at SouthTech, January 31, 2000, defendant signed an adhesive employment agreement containing a covenant not to compete. That agreement provides, in pertinent part:

[T]he Employee hereby expressly covenants and agrees, (which covenant and agreement are the essence of this Agreement), that Employee will not, during his employment with the Employer, nor for a period of eighteen (18) months after the termination of his employment . . .

(a) cause or attempt to cause any of the Customers of the Employer, wherever located, to refrain from patronizing Employer in whole or in part; . . .

(e) compete with Employer by working for, consulting or advising any person, business or entity in a business similar in function and/or purpose to, or competitive with, that of Employer; . . .

(g) work for or with, directly or indirectly, any of the Manufacturers for which Employer sells products. . . .

(*l* ) in the following divisible and severable territorial divisions:

(i) within the Counties of *see attachment* "Exhibit A".

(ii) All counties which are contiguous to "Exhibit A".

(iii) within the State of North Carolina.

(iv) within the states of North Carolina, South Carolina and Virginia.

(m) The eighteen (18) month time period specified herein shall be tolled and shall not run during any time the Employee is in violation of this Paragraph 11, it being the intent of the parties that the Employer is entitled to eighteen (18) months free of competition of the Employee as described herein.

(Pl's Exh. A ¶ 11.) The agreement further provides that the covenants contained in Paragraph 11 are severable and separately enforceable. (*Id.* ¶¶ 18–19.) The agreement further provides for enforcement through an injunction restraining any violation of the restrictive covenant, "it being understood that it takes only a few days to destroy the goodwill and patronage of the Employer by hostile activities of the Employee." (*Id.* ¶ 15.)

4. The "Exhibit A" attached to defendant's employment agreement listed twenty North Carolina counties and five South Carolina counties in the area surrounding Charlotte, North Carolina. These counties, by and large, constituted defendant's sales territory during his first year of employment at SouthTech. The "Exhibit A" also listed nine manufacturers for which defendant was responsible for selling products during his first year of employment. (*Id.* "Exhibit A".) Also attached to defendant's employment agreement was an "Exhibit B" outlining plaintiff's proposed compensation and benefits package. (*Id.* "Exhibit B".) Both "Exhibit A" and "Exhibit B" were initialed by defendant and by Player Barefoot on behalf of plaintiff. The employment agreement itself was executed by defendant and by Player Barefoot on behalf of plaintiff.

5. There is a genuine dispute of material fact as to whether there was a valid offer and acceptance of employment prior to defendant's signing the employment agreement on his first day of work, and if so, whether the written agreement placed sufficient new burdens on plaintiff to constitute adequate consideration. (Pl's Reply Mem., DE # 23, at 3.)

6. Between January 2000 and April 2001, defendant was employed as a sales representative in the sales territory surrounding Charlotte, North Carolina. Defendant was considered a "sub-rep" in that he worked under a senior sales representative for that same territory, Chad Wagner. Defendant's duties included servicing ex-

isting accounts by making sales and filling doctors' orders, assisting in surgeries when requested, and developing new accounts. (Dingus Depo. at 20, 25–26, 43–45; Hughes Depo. at 65; Fowble Aff. ¶¶ 5–6.)

7. In April 2001, defendant was assigned to a new sales territory in western South Carolina, including the cities of Columbia and Greenville. Defendant's reassignment was accompanied by a new commission structure and $15,000 salary increase. Later, defendant was assigned a sub-rep of his own to work with him in the Columbia, South Carolina area. (Dingus Depo. at 30–38; Hughes Depo. at 65.)

8. In connection with defendant's reassignment, plaintiff prepared a new "Exhibit A" to the employment agreement, which listed twenty-two South Carolina counties as defendant's new sales territory, and which ostensibly was intended to supersede the original "Exhibit A" to the employment agreement. (Pl's Exh. B.) However, defendant was not presented with this superseding "Exhibit A" at the time of his reassignment and never signed it.

9. While defendant was employed by SouthTech, first in North Carolina and then in South Carolina, defendant developed professional relationships with many of plaintiff's customers and was exposed to information that plaintiff deemed confidential. This information included:

(a) Account information, inclusive of customer contact information (Barefoot Aff. Exh. D) (filed under seal);

(b) Customer information, including the particular needs, requirements, likes and dislikes of plaintiff's customers (Barefoot Aff. ¶ 26; Pl's Exh. H (filed under seal));

(c) Product pricing information, as provided from the product's manufacturer through pricing catalogs (Hughes Depo. at 21); and

(d) Technical product information, which is made available to employees through trade journals and training sessions organized by the product's manufacturer (Hughes Depo. at 20–21).

10. The industry in which plaintiff and defendant conduct business can be characterized substantially as follows. Manufacturers of orthopedic medical and surgical devices will typically enter into a sales agency agreement with an independent distributor, granting the distributor exclusive sales rights for the manufacturer's products over a specified territory as well as a commission on each sale made. (DeStefano Aff. Exh. 1; Beam Depo. at 7–8.) Thus, while the various manufacturers' products freely compete with one another on the market, the distributorships do not compete to sell any one manufacturer's product. Moreover, product pricing is strictly the province of the manufacturer, such that distributors sell product at a set list price or within a set range of prices, or must obtain the consent of the manufacturer to discount below the list price. (DeStanfano Aff. Exh. 1 § 4.1; Dingus Depo. at 39–41, 104–09; Barefoot Depo. at 53.) In addition to pricing, the demand for product is driven to a significant extent by doctors' preferences for and familiarity with one product over another. In other words, the market is characterized by a certain amount of brand loyalty, so that a doctor who has traditionally used a given line of products is likely to continue using them even when substitute products are available. (Dingus Depo. at 104, 108). This gives any information a distributor has on a customer's needs, requirements, likes and dislikes, some inherent economic value.

11. Prior to May 1, 2005, SouthTech served as a distributor for both ArthroCare and Arthrex. Until this time, ArthroCare manufactured, among other things, a line of radiofrequency surgical wands, while Arthrex manufactured, among other

things, a line of sutures and suture anchors. These brands did not compete with one another and numerous distributors sold both ArthroCare and Arthrex products. (Dingus Depo. at 23–25; Beam Depo. at 11–19.)

12. Sometime in the middle of 2004, Arthrex came out with the "OPES" system of surgical wands, which competed with ArthroCare's similar device. Also, in November 2004, ArthroCare purchased a company called OPUS Medical, which produced a line of tissue re-attachment devices that competed with Arthrex's devices. As a result of pressures from within the industry concerning these conflicts of interest, distributors who had previously sold both lines of products were encouraged to drop one or the other. By letter dated April 26, 2005, SouthTech informed its customers of its decision to abandon its representation of ArthroCare products. (Dingus Depo. at 47–51; Beam Depo. at 13–22; DeStefano Aff. Exh. 3.)

13. Beginning May 1, 2005, ArthroCare was without a distributor in SouthTech's former territory. Around this time, contacts were made between defendant and ArthroCare about defendant leaving SouthTech's employ to become ArthroCare's South Carolina distributor. At some point thereafter, but not later than June 9, 2005, an informal agreement was reached whereby defendant was granted exclusive rights to sell ArthroCare products in the state of South Carolina. (DeStefano Aff. ¶¶ 9–17; Beam Depo. at 27–33.)

14. Defendant began independently selling ArthroCare products in May 2005, while he was still employed at SouthTech, even though a formalized distributorship agreement was not reached until June. Under this arrangement, defendant did not receive any commission on his ArthroCare sales until June 2005. Once commissions began to be paid, they were applied retro-

actively to all sales since January 1, 2005, even though defendant's company Procore is not necessarily to be credited for making those sales. Conversely, Arthrocare has not paid commissions to SouthTech for some of the sales it made prior to May 1, 2005, and SouthTech in turn withheld defendant's share of those commissions from his pay. (Pl's Exh. B, C, E (filed under seal), F; DeStefano Aff. ¶ 24; Dingus Depo. at 57; Beam Depo. at 20–21; Hughes Depo. at 54–55.)

15. Defendant verbally noticed his resignation from SouthTech to Jeff Hughes on June 8, 2005. During this conversation, defendant unequivocally told Hughes that he was planning to take over the ArthroCare distributorship for South Carolina. Defendant also told Hughes that he would continue to service SouthTech's accounts and cover cases for one additional month. Defendant now testifies that he intended for the resignation to be immediately effective, and that he simply agreed to help SouthTech through the transition period. Hughes testifies that he understood defendant to be giving a full month's notice, and that he would not begin work for ArthroCare until after the legal issues surrounding the non-compete agreement had been worked out and in any event no earlier than July 8, 2005. (Dingus Depo. at 60–61; Hughes Depo. at 42–47, 70.) Defendant's final date of employment, however, is not a material fact for the purpose of deciding this motion.

16. The time at which plaintiff can be imputed with knowledge of defendant's alleged violation of the covenant is, however, a material fact. In this regard, the record shows that Jeff Hughes learned of defendant's intention to take over the ArthroCare distributorship for South Carolina on June 8, 2005, and discovered that defendant was actively selling ArthroCare products on behalf of his company, Procore, no

later than July 3, 2005. (Hughes Depo. at 44–46, 68–69.)

17. Plaintiff did not file suit against defendant, seeking preliminary injunctive relief, until August 11, 2005, nine weeks after plaintiff can be imputed with knowledge of defendant's intention to go into competition and six weeks after plaintiff can be imputed with actual knowledge of defendant's competitive activities. During the interim time, plaintiff negotiated with defendant for terms under which it would have released defendant from the covenant. (Pl's Reply Mem., DE # 23, p. 7.) Because the parties' settlement efforts were unavailing, this matter is now before the court for preliminary injunction.

## DISCUSSION

### I. Preliminary Injunction Standard

■ The Fourth Circuit applies the familiar analytical framework first established in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977), and more recently outlined in *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802 (4th Cir.1991), in determining whether to grant preliminary injunctive relief pursuant to Fed.R.Civ.P. 65. First, the moving party must make a "clear showing" that it will suffer irreparable harm if the court denies its request. *Id.* at 812–13. Second, if the moving party establishes irreparable harm, the next step is "to balance the likelihood of irreparable harm to the plaintiff from the failure to grant interim relief against the likelihood of harm to the defendant from the grant of such relief." *Id.* at 812. Third, if the balance tips decidedly in favor of the moving party, "a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus more deliberate investigation." *Id.* at 813. However, "if the balance does not tip decidedly there must be a strong probability of success on the merits." *Id.* Fourth, the court must evaluate whether the public interest favors granting preliminary injunctive relief. *Id.* at 814.

### II. Choice of Law

■ A federal court sitting in diversity applies substantive state law, including the choice-of-law rules of the state in which it sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Pursuant to the terms of the instrument and due to its execution and formation in the state of North Carolina, the covenant at issue is governed by North Carolina substantive law. *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 261 S.E.2d 655, 656 (1980).

### III. Legal Analysis

■ The crux of plaintiff's argument on brief and at hearing is that its success on the merits is likely and consequently that equitable relief ought necessarily to follow. However, the likelihood of success on the merits is not the only, or even the most important, consideration in the application of equity doctrine. *Accord UBS Painewebber, Inc. v. Aiken*, 197 F.Supp.2d 436, 440 (W.D.N.C.2002). As famously summarized by Justice Baldwin in an early opinion:

> The issuing [of] an injunction ... is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages.... It will be refused till the court [is] satisfied that the case before [it] is of a right about to be destroyed, irreparably injured, or great and lasting injury about to be done by an illegal act....

*Bonaparte v. Camden & A.R. Co.*, 3 Fed. Cas. 821, 827 (C.C.D.N.J.1830). Conse-

quently, the decision to grant equitable relief always lies within the sound discretion of the court. *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir.1994).

■ The case on which plaintiff most heavily relies, *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 302 S.E.2d 754 (1983), could be read broadly to suggest that for the purposes of a preliminary injunction motion to enforce a covenant not to compete under North Carolina law, irreparable harm should be presumed from the mere breach of the contract. *Id.* at 762. However, momentarily overlooking the facts that *McClure* purported to apply not North Carolina but New Jersey law,[1] that the opinion was wholly advisory in that it concerned a moot motion,[2] and that a jurisprudence which essentially reduces the test for the issuance of a preliminary injunction to a single question (likelihood of success on the merits) is highly dubious,[3] the actual holding of *McClure* is much narrower than plaintiff asserts and is distinguishable in several respects from the case at bar. First, and most importantly, the court in *McClure* based its decision primarily on the fact that the time limitation of the covenant was of such short duration that failure to grant preliminary relief coupled with the passage of time until a final determination on the merits was reached would effectively "foreclose adequate relief to plaintiff" and "result[ ] in a determination on the merits." *Id.* at 764. Here, by contrast, paragraph 11(m) of the employment agreement pro-

vides that "[t]he eighteen (18) month time period specified herein shall be tolled and shall not run during any time the Employee is in violation of this Paragraph 11, it being the intent of the parties that the Employer is entitled to eighteen (18) months free of competition of the Employee as described herein." Such tolling provisions appear to be valid in North Carolina, *see Manpower of Guilford County, Inc. v. Hedgecock*, 42 N.C.App. 515, 257 S.E.2d 109, 115 (1979), and accordingly plaintiff will not be deprived of any substantial right to equitable relief if that determination is put off until a final judgment on the merits. A second distinguishing feature of *McClure* is that the trial court determined plaintiff actually had no adequate remedy at law because its damages were too speculative, yet also refused to grant the injunction. 302 S.E.2d at 763. It was the fact that plaintiff was left wholly without a remedy, equitable *or* legal, despite a significant likelihood of success on the merits, that the court in *McClure* found particularly objectionable. *Id.* Finally, the court in *McClure* did not discuss how the presence of any countervailing equities might have impacted its decision. In this vein, it is worth mentioning that one other federal court applying North Carolina law explicitly refused to follow *McClure's* presumption of irreparable harm, even after it concluded that the plaintiff was likely to succeed on the merits, because other equities of the case militated against injunctive relief. *Grow Biz*

---

1. *McClure*, 302 S.E.2d at 760.

2. *McClure*, 302 S.E.2d at 759.

3. North Carolina courts apply a two-prong test in determining whether a preliminary injunction should issue: (1) if a plaintiff is able to show likelihood of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if issuance is necessary for the protection of a plaintiff's rights during the course of the litigation. *McClure*, 302 S.E.2d at 759–60. However, if irreparable harm is presumed in all non-compete cases, then any plaintiff would be automatically entitled to a preliminary injunction upon a mere showing of likelihood of success on the merits, a conclusion that runs counter to the inherently discretionary nature of equity jurisdiction, which will not mechanically intervene upon any violation of a legal right.

*Int'l, Inc. v. MNO Inc.,* 2002 WL 113849, at *7–*8 (D.Minn. Jan.25, 2002).

In an attempt to bolster its case for irreparable harm, plaintiff more specifically argues that it will be irreparably harmed by the loss of valuable customer relationships and customer goodwill, in that defendant's actions have "caused an immediate and unequivocal loss of sales by Southtech." (Barefoot Aff. ¶¶ 36, 38.) However, it is axiomatic that purely economic injury, such as that resulting from lost sales, profits or market share, does not constitute irreparable harm sufficient to warrant injunctive relief, *see Mylan Pharmaceuticals, Inc. v. Thompson,* 207 F.Supp.2d 476, 485 (N.D.W.Va.2001), and North Carolina courts routinely recognize monetary damages measured by lost profits as adequate to redress a breach of a covenant not to compete, *see, e.g., Moses H. Cone Mem. Health Services Corp. v. Triplett,* 167 N.C.App. 267, 605 S.E.2d 492, 497 (2004) (citing *Keith v. Day,* 81 N.C.App. 185, 343 S.E.2d 562, 568–69 (1986)). Generally, it is in cases where a defendant's conduct threatens to cripple or substantially alter a going concern that irreparable harm will be found, *see, e.g., Federal Leasing v. Underwriters at Lloyd's,* 650 F.2d 495, 500 (4th Cir.1981); *Turnage v. United States,* 639 F.Supp. 228, 232 (E.D.N.C.1986); although courts in this circuit have held that "the possibility of permanent loss of customers to a competitor or the loss of goodwill" will constitute irreparable harm where the damages are intangible and thus impossible to ascertain, *see, e.g., Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 551–52 (4th Cir. 1994).

Here, plaintiff's mere allegation that "Southtech's sales ... are down in [defendant's] former territory" (Barefoot Aff. ¶ 38) is insufficient to demonstrate an immediate threat of irreparable harm for which there is no legal remedy. Furthermore, while plaintiff's money damages may very well be difficult to ascertain in this case, this is due to the fact that plaintiff's loss of customers and/or goodwill is just as likely attributable to plaintiff's own strategic business decisions as defendant's competitive conduct. For example, plaintiff's exhibit H (filed under seal) reveals that what SouthTech deems to be its confidential customer information amounts to little more than a compilation of which customers traditionally use or prefer what brand of products. The evidence tends to show that the economic value of this information is derived from the fact that surgeons tend to purchase brands of instruments which they are familiar with and like. Thus, it can reasonably be assumed that a surgeon who has traditionally used ArthroCare products would have ceased patronizing SouthTech and begun patronizing Procore not because of any solicitation on the part of the defendant but because SouthTech chose no longer to carry the preferred product. Indeed, when plaintiff's counsel questioned defendant about former South-Tech customers who began purchasing from Procore, defendant testified that the sales he "took away" from plaintiff occurred only because the purchasing account specifically sought out the ArthroCare line of products, with these inquiries being referred to defendant who had taken responsibility for the ArthroCare distributorship. (Dingus Depo. at 104–09.) In these circumstances, where plaintiff's harm is difficult to ascertain not because of its intangible nature but because it cannot readily be attributed to the conduct of one party or the other, equity will not intervene to cease the speculative harm to plaintiff at a very significant and tangible cost to defendant. *Cf. Faulkner v. Jones,* 10 F.3d 226, 235–36 (4th Cir.1993) ("[A]ny inquiry into the irreparable harm resulting from the denial of interim relief *must* nec-

essarily *begin* with an analysis of the degree to which that particular relief remedies the alleged injuries.").

Next, plaintiff claims that it will be irreparably harmed by the misappropriation of its trade secrets, which allegedly include knowledge of customer lists and preferences, pricing, and the technical aspects of the product lines. (Barefoot Aff. ¶ 25–27, 36; Hughes Depo. at 18–22.) It is undisputed that the information claimed by plaintiff to constitute trade secrets is considered to be confidential within the company. (Dingus Depo. at 44–45; Hughes Depo. at 18–22.) However, confidentiality is a necessary but not a sufficient condition for trade secret protection. Under North Carolina law, a "trade secret" is defined as business information that "derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development ... by persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen.Stat. § 66–152(3). In this case, plaintiff has not met its tentative burden of showing that it possessed trade secrets which defendant might have misappropriated. For example, competitors' product information and price lists are readily obtainable through lawful methods. (DeStefano Aff. ¶¶ 28–30.) Moreover, the picture painted by the record of the medical supply industry is of a fairly price inelastic market where the vast majority of sales are made at the manufacturer's list price and customer preferences drive product sales. (Dingus Depo. at 39–41, 104–09; Barefoot Depo. at 53.) In such circumstances, the court fails to see how a significant competitive advantage could be obtained by knowledge of a competitor's list prices. Likewise, customer lists are considered readily ascertainable if they can be easily compiled just by looking through a telephone book, as a list of hospitals and orthopedic surgeons certainly can. *Novacare Orthotics & Prosthetics East, Inc. v. Speelman,* 137 N.C.App. 471, 528 S.E.2d 918, 922 (2000). Finally, while special knowledge of customer needs and preferences might ordinarily constitute a trade secret, *see Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC,* 620 S.E.2d 222, 226–27 (N.C.Ct.App.2005), again the structure of the market described by the parties would suggest that these ordinary assumptions do not apply here. This is because SouthTech and Procore are not directly competing with each other to sell the same product. Rather, each has the exclusive right to sell certain manufacturers' products in a given territory, under circumstances in which a few items in those manufacturers' product lines may be deemed substitute goods. (Dingus Depo. at 121–23.) In a price inelastic market driven by customer preferences, knowledge that a particular customer prefers brand X to brand Y has economic value to the distributor for brand X but little or no economic value to the distributor for brand Y. For example, knowledge that Dr. Jones prefers Arthrex products, while certainly a valuable piece of information to plaintiff as the Arthrex distributor, is of little economic value to defendant who has no rights to sell Arthrex. Likewise, knowledge that Dr. Smith prefers ArthroCare products, while certainly a valuable piece of information to defendant now that he has become the ArthroCare distributor, is no longer of any economic value to plaintiff, which has relinquished all sales rights to ArthroCare products.

Even if plaintiff had made out a colorable threat of irreparable harm in this case, the balance of equities does not favor the entry of a preliminary injunction. First, and most importantly, the harm defendant will incur if an injunction is improperly granted substantially outweighs

any harm that plaintiff will incur from a failure to grant the preliminary injunction. Defendant succeeded in winning the contract to be ArthroCare's distributor in South Carolina after this business opportunity was created by an unanticipated change in the competitive marketplace and plaintiff's subsequent decision to abandon its representation of ArthroCare. Where distributorship agreements in this industry are characterized, by exclusive sales rights over large territories (see DeStefano Aff. Exh. 1), such opportunities are undoubtedly rare. If the court orders defendant to cease doing business until a final judgment is reached, ArthroCare will, in the interim, have to find a new distributor, and the court will have no power to restore defendant's contract if it is later determined that injunctive relief is not warranted. Accordingly, defendant faces not only the loss of an income for the months he will be unemployed but also the loss of the business expectancies created by the distributorship agreement he now holds. Defense counsel's representation that adequate security would be in the millions of dollars further suggests that the potential harm to defendant cannot be fully mitigated by posting bond. On the other hand, as discussed above, paragraph 11(m) of the employment agreement tolls the time limitation of the non-compete as long as defendant is in violation of it, and so plaintiff will not be deprived of its bargained-for remedy if it later turns out that injunctive relief is warranted.

■ Second, the six to nine week delay between plaintiff's discovery of defendant's competitive activities and its filing suit weighs against injunctive relief. Defendant raised the equitable defense of laches, which requires a finding that plaintiff delayed unreasonably in filing suit after discovering the facts giving rise to the cause of action, and prejudice to the defendant caused by detrimental reliance on plaintiff's delay. *White v. Daniel,* 909 F.2d 99,

102 (4th Cir.1990). A laches defense is unsupportable in this case because Jeff Hughes made clear upon first learning of defendant's resignation that SouthTech viewed defendant's intention to take over the ArthroCare distribution as a violation of the covenant not to compete (Hughes Depo. at 42–43), and defendant suffered no prejudice from the modest delay in filing suit because he had already taken all the necessary steps to assume the ArthroCare distributorship prior to the time plaintiff can be imputed with knowledge of defendant's subversive intentions. However, a delay insufficient to support a laches defense may nonetheless mitigate against preliminary injunctive relief where the delay is indicative not of unfair prejudice to the defendant but rather of a lack of imminent and irreparable harm to the plaintiff. *Cf. Central Point Software, Inc. v. Global Software & Accessories, Inc.,* 859 F.Supp. 640, 644–45 (E.D.N.Y.1994) (cited in 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2946 n. 17 (2d ed.1995)). Here, plaintiff seeks to specifically enforce a rather far-reaching restrictive covenant pursuant to which the parties agreed that injunctive relief is an appropriate remedy on account of the very fact that "a[ny] violation ... will cause such damage to the Employer as will be irreparable ..., *it being understood that it takes only a few days to destroy the goodwill and patronage of the Employer* by hostile activities of the Employee." (Pl's Exh. A ¶ 15 (emphasis added).) Yet plaintiff waited at least six weeks after it knew of defendant's "hostile activities" before seeking injunctive relief, all the while negotiating with defendant concerning the payment of *money* to release him from the covenant. (Pl's Reply Mem., DE # 23, p. 7). Where plaintiff's actions tend to undercut the necessity of very right contemplated by the contract, the court is reluctant to grant such an

extraordinary remedy as a preliminary injunction, which is justified only when the urgency of preventing irreparable harm to plaintiff overshadows the fairness to defendant of awaiting final judgment on the merits.

Third, the public interest weighs against entry of the injunction sought. While the public at large has an interest in ensuring that contracts are enforced, the citizens of South Carolina have a vital interest in quality and efficient health care. Surgeons often rely on the presence of sales representatives during surgery to provide the required instruments and answer technical questions, and a significant portion of a sales representative's job responsibilities include assisting surgeries in this way. (Fowble Aff. ¶ 5; Dingus Depo. at 25–26; Hughes Depo. at 45–46, 48.) Since Procore is now the exclusive distributor of ArthroCare products in the state of South Carolina, the entry of an injunction would not only deprive defendant of his livelihood but also deprive ArthroCare of its ability to dispense, and orthopedic surgeons of their ability to readily obtain, the products and technical expertise necessary to effectively treat patients. (Fowble Aff. ¶ 6.) Thus, the potential negative impact of an injunction on numerous third parties and the public at large factors significantly against any preliminary injunctive relief. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) ("[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

Finally, even assuming that the equities were nearly in equipoise, plaintiff has failed to demonstrate a "strong probability" of success on the merits. The court tentatively agrees that plaintiff has succeeded in demonstrating that the non-compete in question is not *per se* unenforceable, as the temporal and geographic scope

of the covenant appears to fall within bounds of reasonableness recognized in North Carolina case law. *See, e.g., Precision Walls, Inc. v. Servie*, 152 N.C.App. 630, 568 S.E.2d 267 (2002). But, as discussed herein, the particular circumstances of this case leave open for debate the extent to which the various provisions of the covenant meet or exceed plaintiff's need to protect legitimate business interests uniquely related to the industry in which it operates and other case-specific facts. For example, paragraph 11(g) of the employment agreement, which precludes a former employee from "work[ing] for or with, directly or indirectly, any of the Manufacturers for which the Employer sells products," may be facially overbroad in that it could be construed as prohibiting defendant from being employed in a host of non-competitive capacities, such as a custodian. *See Hartman v. W.H. Odell & Assoc., Inc.*, 117 N.C.App. 307, 450 S.E.2d 912, 920 (1994). On the other hand, paragraph 11(a), which precludes a former employee from "caus[ing] or attempt[ing] to cause any of the Customers of the Employer, wherever located, to refrain from patronizing Employer in whole or part," may be facially reasonable under North Carolina law, *see Triangle Leasing Co. v. McMahon*, 327 N.C. 224, 393 S.E.2d 854 (1990), but it is unclear whether plaintiff's loss of customers was proximately caused by defendant's efforts at solicitation or by plaintiff's choice to terminate its distributorship agreement with ArthroCare. Finally, there is a dispute over the formation and validity of the contract itself. Each of these questions requires a finding of fact that is either in dispute or not sufficiently developed in the record before the court. Accordingly, although plaintiff has "raised questions going to the merits" substantial enough to "make them fair ground for litigation," plaintiff has failed to demonstrate the greater quantum of proof

("strong probability of success on the merits") required where the balance of equities does not tip decidedly in plaintiff's favor. *Direx Israel,* 952 F.2d at 813.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332(a)(1).

2. North Carolina law governs the formation, construction, and enforcement of the employment contract and the restrictive covenant contained therein.

3. Plaintiff has failed to demonstrate a threat of irreparable harm, in that its alleged loss of customers, sales, and market share is compensable in money damages.

4. Plaintiff has failed to demonstrate a threat of irreparable harm, such as can be remedied by the entry of an injunction, in that plaintiff's alleged loss of customers and goodwill may be wholly or partially attributable to plaintiff's own strategic business decisions.

5. Plaintiff has failed to demonstrate a threat of irreparable harm, in that it has not met its preliminary burden of showing the existence of valuable trade secrets which defendant has misappropriated.

6. The balance of equities weighs in favor of defendant, in that a preliminary injunction would likely have the effect of permanently depriving defendant of this opportunity to establish and operate a distributorship, while plaintiff will not be deprived of any substantial right since it may renew its argument in favor of injunctive relief should it be victorious on the merits.

7. Plaintiff's six to nine week delay between its discovery of defendant's competitive activities and its decision to seek an injunction weighs against preliminary injunctive relief, where plaintiff explicitly bargained for the right to expedited injunctive relief due to the fact that a former employee's hostile activities can cause irreparable harm in a matter of days.

8. The public interest weighs against injunctive relief, in that the supply chain of medical products will be disrupted, and consequently numerous third parties and the public at large will be adversely affected, by the entry of an injunction against defendant.

9. Plaintiff has failed to demonstrate a strong possibility of success on the merits, in that there are numerous material facts either genuinely disputed or insufficiently developed in the present record.

## CONCLUSION

In consideration of the foregoing, plaintiff's motion for a preliminary injunction (DE # 5) is DENIED.

SO ORDERED.