Global Textile All., Inc. v. TDI Worldwide, LLC, 2017 NCBC 106.

STATE OF NORTH CAROLINA

COUNTY OF GUILFORD

GLOBAL TEXTILE ALLIANCE, INC.,

Plaintiff,

v.

TDI WORLDWIDE, LLC; DOLVEN ENTERPRISES, INC.; TIMOTHY DOLAN, individually and in his capacity as an officer, shareholder and director of Dolven Enterprises, Inc. and an officer of TDI Worldwide, LLC; JAMES DOLAN, individually and in his capacity as an officer, shareholder and director of Dolven Enterprises, Inc.; STEVEN GRAVEN, individually and in his capacity as an officer, shareholder and director of Dolven Enterprises, Inc.; RYAN GRAVEN, individually and in his capacity as an officer, shareholder and director of Dolven Enterprises, Inc.; GARRETT GRAVEN, individually; GUANGFAYNAN, LTD.; GUANGFAYNAN, LTDA; GUANGFAYNAN COOP; GUANGFAYNAN SHANGHAI; and FRESH INDUSTRIES, INC.,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 7304

**ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANTS' MOTION TO STRIKE**

THIS MATTER comes before the Court on Plaintiff Global Textile Alliance, Inc.'s Motion for Preliminary Injunction (ECF No. 6) and Defendants' Motion to Strike Reply Affidavits and Reply Brief (ECF No. 88; collectively, the "Motions").

THE COURT, having considered the Motions, the briefs in support of and in opposition to the Motions, the affidavits and other supporting documents filed by the parties, and the arguments of counsel at the hearing, concludes that the Motion to

Strike should be GRANTED in part, and DENIED in part, and the Motion for Preliminary Injunction should be DENIED, for the reasons set forth below.

*Hagan Barrett & Langley PLLC, by J. Alexander S. Barrett, Esq. and Kurt A. Seeber, Esq. for Plaintiff Global Textile Alliance, Inc.*

*James, McElroy & Diehl, P.A., by Fred B. Monroe, Esq. and Carl M. Short III, Esq. for Defendants TDI Worldwide, LLC and Timothy Dolan.*

*K&L Gates LLP, by A. Lee Hogewood III, Esq., John R. Gardner, Esq., and Matthew T. Houston, Esq. for Defendants Dolven Enterprises, Inc. and Ryan Graven.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Eric M. David, Esq., Brian C. Fork, Esq., and Shepard D. O'Connell, Esq. for Defendant James Dolan.*

*Ellis & Winters LLP, by Jonathan A. Berkelhammer, Esq., Steven A. Scoggan, Esq., and Scottie Forbes Lee, Esq. for Defendant Steven Graven.*

*Morningstar Law Group, by Shannon R. Joseph, Esq. and Jeffrey L. Roether, Esq. for Defendant Garrett Graven.*

McGuire, Judge.

## FACTUAL AND PROCEDURAL BACKGROUND

1.     Plaintiff Global Textile Alliance, Inc. ("GTA") is a North Carolina corporation formed in 2001 and headquartered in Reidsville, North Carolina. Luc Tack ("Tack"), a Belgian national, is the sole shareholder of GTA. Tack is a member of GTA's Board of Directors.

2.     GTA is in the business of manufacturing and sourcing fabrics, mattress ticking, covers, and other textiles to the bedding, upholstery, and home furnishings industries. GTA does business in the United States, Europe, Asia, and South America, and its customers include the world's largest manufacturers of bedding

components and foam mattresses. GTA designs and develops colors for the fabric it sells. GTA manufactures its fabric designs itself and also sources some manufacturing of its fabric designs to contract manufacturers in China.

3. Defendant Timothy Dolan ("Timothy") was GTA's President and CEO from GTA's formation until he was removed from those positions on or around August 21, 2015. He remained an employee of GTA until he was terminated on or around September 21, 2016. He was also a member of GTA's Board of Directors until he resigned on or around September 22, 2016.

4. Defendant Steven Graven ("Steven") joined GTA shortly after its formation. He was a member of GTA's Board of Directors and was GTA's Vice President until his resignation from both positions in August 2017. At all relevant times, Tack, Timothy, and Steven were the only members of GTA's Board of Directors.

5. Ryan Graven ("Ryan") is Steven's son and was hired by GTA in 2005 to oversee GTA's sourcing of fabrics in China. In this position, Ryan reported to Timothy. In October 2010, GTA formed GTA-Asia, a wholly owned subsidiary of GTA. Ryan was the head of GTA-Asia's operations until 2012, at which time GTA hired Steven's son and Ryan's brother, Garrett Graven ("Garrett"), as director of GTA-Asia. Garrett was supervised in this role by Timothy and Ryan.

6. GTA did not have non-competition agreements with Timothy, Steven, Ryan, or Garrett. Steven and Garrett signed confidentiality agreements with GTA in September 2016.

7. Ryan's primary responsibilities were to locate and "vet" Chinese fabric manufacturers who could produce fabrics that GTA designed, manage the quality of the fabric produced by these manufacturers, ensure delivery to GTA's customers, and provide customer service to GTA's customers relating to GTA's operations in China. (Ryan Graven Aff., ECF No. 61.1 at ¶ 3.) Ryan had no prior experience in, or knowledge of, the textile industry prior to being employed by GTA.

8. The fabric manufactured and sourced by GTA must be further processed into final products for GTA's customers using "cut-and-sew" operations. The parties dispute the extent to which GTA was involved in cut-and-sew operations. Defendants contend that GTA was not interested in being involved in cut-and-sew operations because it was too labor intensive and expensive and, therefore, mostly performed by offshore operators. (Steven Graven Aff., ECF No. 60.1 at ¶ 9.) GTA does not clearly explain its involvement in cut-and-sew operations in China and Asia but claims that it was involved in "sourcing" cut-and-sew operations in China since as early as 2009. (Luc Tack Reply Aff., ECF No. 83.2 at ¶ 14.)

9. Nevertheless, it is undisputed that GTA had a cut-and-sew plant at its Reidsville facility from 2011 through 2014. Defendants contend that GTA did cut-and-sew work only for a few specifically identified customers. (ECF No. 60.1 at ¶ 10.) GTA, however, contends that the cut-and-sew operations in Reidsville served a substantial customer base. (ECF No. 83.2 at ¶ 14.)

10. Defendants contend that GTA's customers typically made their own arrangements for any cut-and-sew work on the fabrics that the customers purchased

from GTA, either by contracting with cut-and-sew vendors that the customer had identified, or by asking GTA to introduce them to a cut-and-sew vendor in China. Defendants argue that this arrangement led to problems for GTA, including: (1) after performing cut-and-sew work on GTA's fabrics, the Chinese cut-and-sew operators would subsequently buy the same or similar fabric from another manufacturer and sell directly to GTA's customer, cutting GTA out of the process and reducing the "life cycle" of GTA's fabrics; and (2) GTA sometimes was blamed for poor quality work performed by vendors that GTA had introduced to its customers. (ECF No. 61.1 at ¶¶ 6–7; ECF 60.1 at ¶ 13.)

11. In or around 2009, Ryan approached Timothy and Steven with a proposal to form a company that would directly manage the cut-and-sew operations and supply chain in China to ensure that GTA was not cut out of the process. Timothy and Steven claim that GTA was not interested in managing cut-and-sew operations in China and that they did not believe the proposed business was competitive with GTA's business. Timothy and Steven approved Ryan's proposal to form the business. (ECF No. 60.1 at ¶ 16.) Timothy, Steven, and Ryan did not share Ryan's proposal or the creation of the proposed business with Tack.

12. In 2009, Ryan formed Defendant Guangfaynan Ltd ("GFY"). Ryan subsequently formed Defendants Guangfaynan Ltda, Guangfaynan Coop, Guangfaynan Shanghai, and Fresh Industries, Inc. as businesses related to GFY (hereinafter, Guangfaynan Ltd, Guangfaynan Ltda, Guangfaynan Coop, Guangfaynan Shanghai, and Fresh Industries, Inc. are referred to collectively as

"GFY"). It is not clear from the record evidence whether Timothy or Steven initially had an ownership interest in GFY.

13.    In August 2013, Ryan, Timothy, Steven, and Timothy's brother, Defendant James Dolan ("James")[1] formed Defendant Dolven Enterprises, Inc. ("Dolven"). Each of the four owned 25% of Dolven. Timothy and Steven were directors of Dolven. Dolven owns and controls GFY, and it effectively has stepped into the shoes of GFY with regard to GFY's business relationship with GTA. As with GFY, Timothy, Steven, and Ryan did not disclose their ownership interest in Dolven to Tack.

14.    GTA, through Timothy, subsequently entered into business relationships and transactions with GFY and Dolven to manage the sourcing of fabric manufacturers and cut-and-sew operations for GTA in China. GFY and Dolven became the primary contacts with GTA's customers in China. Since Ryan, Timothy, and Steven conducted business for GFY and Dolven, GTA's customers were allegedly led to believe that GFY and Dolven were part of GTA. (Verified Compl., ECF No. 4 at ¶ 39.) It is undisputed that GFY and Dolven did at least tens of millions of dollars of business with GTA from 2009 through 2017.

15.    In April 2015, during a meeting of GTA's board of directors, Tack first learned that Dolven was owned by Timothy, Steven, and Ryan. Dolven subsequently provided GTA with its books and records and cooperated in an investigation of Dolven's business by GTA. In an August 2015 meeting of GTA's board of directors,

---

[1] On November 13, 2017, Plaintiff voluntarily dismissed its claim for misappropriation of trade secrets against James Dolan. (ECF No. 124.) Plaintiff has not alleged any claim for breach of fiduciary duty against James.

Tack told Timothy and Steven that the relationship between GTA and Dolven was "not acceptable." (Timothy Dolan Aff., ECF No. 65.1 at ¶ 40.)

16.     In August 2015, Tack removed Timothy as President and CEO of GTA, but Timothy remained an employee of GTA until September 21, 2016, when GTA terminated Timothy's employment. Steven resigned his employment with GTA on August 11, 2017.

17.     Timothy remained on GTA's Board of Directors until on or about September 22, 2016, and Steven remained on GTA's Board of Directors until on or about August 11, 2017.

18.     At the time GTA learned of Dolven's ownership, GTA and Dolven were in the process of negotiating a very large contract with one of GTA's customers. The contract was finalized in or around early 2016. GTA contends that because of the new contract, it was required to maintain its relationship with Dolven while GTA established an infrastructure that could replace Dolven. (ECF No. 4 at ¶ 54.) GTA continued its business relationship with Dolven until in or about August 2017.

19.     In April 2016, a year after Tack first learned that Dolven was owned by Timothy, Steven, and Ryan, GTA's counsel sent letters to Timothy and Steven "regarding the claims GTA has against you, other individuals, and Dolven . . . and its subsidiaries and affiliates, including [GFY] . . . arising from the creation and funding of Dolven and its affiliates and the business which it and they have [*sic*] conducted with GTA." (ECF No. 60.1, Ex. D.) The letter stated that its purpose was to place those parties "on notice of GTA's intention to recover its damages concerning and

associated with the creation and operation of" Dolven and GFY. (*Id.*) GTA took no further action to pursue the claims at that time.

20. On October 26, 2016, Timothy formed Defendant TDI Worldwide, LLC ("TDI"). TDI sources fabrics through independent contractor manufacturers for customers in the home furnishings industry, but it does not engage in cut-and-sew operations. TDI has not done business with Dolven or GFY. TDI has not employed or done business with Steven, Ryan, or Garrett.

21. Dolven and GFY remain in business and are ongoing concerns. Timothy, Steven, Ryan, and James are shareholders of Dolven, but Timothy and Steven resigned from Dolven's Board of Directors in September 2015 after Tack learned about Dolven's ownership. Ryan and James are the only two current directors of Dolven, and Ryan also currently serves as Dolven's President.

22. Steven has not been employed since his departure from GTA.

23. Garrett resigned from employment with GTA in February 2017 and is now employed with a company in New Jersey that is not affiliated with GTA, Dolven, GFY, or TDI.

24. On August 15, 2017, GTA filed its Verified Complaint. In the Verified Complaint, GTA makes the following claims:

    a. Actual and constructive fraud against Timothy, Steven, Ryan, Garrett, Dolven, and GFY;

    b. Conspiracy against Timothy, Steven, Ryan, Garrett, and James;

    c. Embezzlement and conversion against Timothy and Steven;

d.  Common law unfair competition/business conversion against all Defendants;

e.  Unfair and deceptive trade practices against all Defendants;

f.  Misappropriation of trade secrets against all Defendants;

g.  Breach of fiduciary and other duties against Timothy, Steven, Ryan, and Garrett;

h.  Constructive trust against all Defendants;

i.  Fraudulent transfer pursuant to N.C.G.S. § 39-23.1 (hereinafter "G.S.") against Timothy, James, Steven, Ryan, Dolven, GFY, and the GFY entities; and

j.  Preliminary and permanent injunction against all Defendants.

25.  GTA alleges that Timothy, Steven, Ryan, and Garrett breached fiduciary duties to GTA. GTA alleges that Timothy, Steven, and Ryan failed to disclose and concealed their ownership in GFY and Dolven from Tack, and improperly took the business opportunity of GFY and Dolven for themselves. GTA also alleges that after GFY was formed, Timothy, Steven, and Ryan diverted to GFY and Dolven corporate opportunities that rightfully belonged to GTA.

26.  GTA also alleges that all of the Defendants misappropriated GTA's trade secrets, including: "GTA's technical, product and manufacturing know how [*sic*], its customer list, customer and supplier contact information, supplier capabilities and expertise, sourcing, cost and pricing information and resulting profit

margins for fabric programs." (ECF No. 4 at ¶ 103.) GTA alleges that Defendants, including GFY, Dolven, and TDI, have used GTA's trade secrets to compete with GTA.

27. On September 1, 2017, GTA filed the Motion for Preliminary Injunction. The Motion for Preliminary Injunction requests that the Court enjoin "all Defendants" from:

a. "Contacting, soliciting or communicating in any way, or engaging in any business or commerce of any kind, including but not limited to, any sales of goods, trades, exchanges, or transportation, logistics or other services or other transactions, whether individually or in concert with any other person or entity, and whether directly or indirectly, with any customer, supplier or vendor of GTA;"

b. "Any dissemination, disclosure, or use of any kind of any confidential or proprietary information or trade secret of GTA;"

c. "Encumbering, disposing of, pledging, assigning, using, conveying, selling, moving, transporting, or otherwise impairing any shares or interests or property, money, equipment, building, inventory, assets, accounts or the like which are part of or owned by any of the Defendants, pending a final resolution of this case; and"

d. "For such other and further injunctive relief as may be necessary or proper for the protection of GTA during the pendency of this litigation."

(ECF No. 6 at p. 2.) In support, GTA filed a memorandum, affidavits, and other supporting evidence.

28.     Each of the Defendants filed responses in opposition to the Motion for Preliminary Injunction, along with affidavits and other evidentiary materials.

29.     On October 13, 2017, GTA filed a Reply Brief in Support of Motion for Preliminary Injunction (ECF No. 83) and four accompanying affidavits. (Luc Tack Reply Aff., ECF No. 83.2; Remy Tack Reply Aff., ECF No. 83.7; Gregory Tack Reply Aff., ECF No. 83.10; Kim Thompson Reply Aff., ECF No. 83.11.) On October 18, 2017, Defendants filed a Motion to Strike. (ECF No 88.) On October 20, 2017, GTA filed a response in opposition to the Motion to Strike. (ECF No. 92.)

30.     On October 23, 2017, the Court held a hearing on the Motions, and they are now ripe for resolution.

## ANALYSIS

*A.     Motion to Strike*

31.     In the Motion to Strike, Defendants ask that the Court strike GTA's reply brief and the affidavits filed with GTA's reply. Defendants contend that the reply brief is not limited to discussion of matters newly raised in Defendants' briefs responding to the Motion for Preliminary Injunction (Business Court Rule 7.7), and that the reply affidavits should have been filed with the Motion for Preliminary Injunction (Business Court Rule 7.5). Defendants also argue that the Reply Affidavits contain inadmissible legal conclusions and testimony that is not based on the affiants' personal knowledge. (Defs.' Br. Supp. Mot. Strike, ECF No. 89 at p. 4.) In response,

GTA argues that the reply brief and the affidavits address matters newly raised by Defendants in their responses to the Motion for Preliminary Injunction, and that the reply affidavits contain permissible conclusions based on the facts stated in those affidavits. (ECF No. 92 at pp. 4, 8.)

32. In support of its Motion for Preliminary Injunction, GTA originally filed only three affidavits and largely relied on the allegations made in the Verified Complaint. The Reply Affidavits filed by GTA are much lengthier and more detailed than the original affidavits. The Court concludes that much of what is contained in the reply affidavits is information that should have been included in GTA's initial affidavits in support of the Motion for Preliminary Injunction. Nonetheless, certain portions of the Reply Affidavits address issues newly raised by Defendants in their responses to GTA's Motion for Preliminary Injunction.

33. "A motion to strike is addressed to the sound discretion of the trial court." *Kingsdown, Inc. v. Hinshaw*, 2016 NCBC LEXIS 15, at *8 (N.C. Super. Ct. Feb. 17, 2016) (citing *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 25, 588 S.E.2d 20, 25 (2003)). The Court believes it can parse the reply brief and affidavits and consider only the parts of the brief and affidavits that address information newly raised in Defendants' responses. Accordingly, in considering the Motion for Preliminary Injunction, the Court will consider those parts of the reply brief and affidavits that address issues newly raised in Defendants' responses, and will disregard the remaining portions. Defendants' Motion to Strike is therefore GRANTED, in part, and DENIED, in part.

### B. *Preliminary Injunction – Standard of Review*

34. A preliminary injunction may be issued during litigation when "it appears by affidavit that a party thereto is doing or threatens or is about to do . . . some act . . . in violation of the rights of another party to the litigation respecting the subject of the action, and tending to render the judgment ineffectual." G.S. § 1-485(2). A preliminary injunction is "an extraordinary remedy and will not be lightly granted." *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 692, 228 S.E.2d 478, 483 (1976). The movant bears the burden of establishing the right to a preliminary injunction. *Pruitt v. Williams*, 288 N.C. 368, 372, 218 S.E.2d 348, 351 (1975). To obtain a preliminary injunction a movant must show "a likelihood of success on the merits of his case and . . . [that the movant] is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of his rights during the course of litigation." *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 466, 579 S.E.2d 449, 452 (2003); *accord Looney v. Wilson*, 97 N.C. App. 304, 307–08, 388 S.E.2d 142, 144–45 (1990). Likelihood of success means a "reasonable likelihood." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 404, 302 S.E.2d. 754, 761 (1983).

35. The issuance of an injunction is "a matter of discretion to be exercised by the hearing judge after a careful balancing of the equities." *State ex rel. Edmisten v. Fayetteville St. Christian Sch.*, 299 N.C. 351, 357, 261 S.E.2d 908, 913 (1980). A preliminary injunction "should not be granted where there is a serious question as to the right of the defendant to engage in the activity and to forbid the defendant to do

so, pending the final determination of the matter, would cause the defendant greater damage than the plaintiff would sustain from the continuance of the activity while the litigation is pending." *Bd. of Provincial Elders v. Jones*, 273 N.C. 174, 182, 159 S.E.2d 545, 551–52 (1968); *accord Cty. of Johnston v. City of Wilson*, 136 N.C. App 775, 780, 525 S.E.2d 826, 829 (2000) (noting that a court should weigh "the advantages and disadvantages to the parties" in deciding whether to issue a preliminary injunction).

### C. *Likelihood of Success on the Merits*

36. In support of its Motion, GTA has argued only the merits of its claims for breach of fiduciary duties and for misappropriation of trade secrets. (Br. Supp. Mot. Prelim. Inj., ECF No. 7 at pp. 16–24.) Accordingly, the Court will address only those claims in determining the likelihood of success on the merits.

#### i. *Breach of Fiduciary Duties*

37. GTA claims that Timothy and Steven breached their fiduciary duties to GTA as officers and directors of GTA. GTA also claims that Ryan and Garrett, though not officers or directors, owed fiduciary duties to GTA as "employees of GTA in charge of GTA's China operations." (ECF No. 4 at ¶¶ 108–09.) GTA does not allege, and there is no evidence to suggest, that James owed fiduciary duties to GTA.

38. Under North Carolina law, a fiduciary relationship is defined as "one in which there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707

(2001) (internal quotations omitted). A corporation's directors and officers owe fiduciary duties of loyalty and due care to the corporation and must act in good faith. G.S. § 55-8-30 and § 55-8-42; *Governor's Club Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 248, 567 S.E.2d 781, 786–87 (2002). The duties imposed on a corporate officer are substantial. *RCJJ, LLC v. RCWIL Enters., LLC*, 2016 NCBC LEXIS 46, at *23 (N.C. Super. Ct. June 20, 2016).

> An officer [must] always discharge the responsibilities of the office with undivided loyalty to the corporation and a director may not allow his self-interest to jeopardize his unyielding obligations to the corporation. This imposes an affirmative obligation: a fiduciary must strive to advance the best interests of the corporation. This obligation must be carried out in good faith, openly, honestly, conscientiously, and with the utmost devotion to the corporation. Nevertheless, the analysis of an officer's fiduciary conduct must be judged in light of the background in which it occurs and the circumstances under which he serves the corporation.

*Id.* at **22–24 (quotations omitted) (citing *Seraph Garrison v. Garrison*, 787 S.E. 2d 398 (N.C. App. 2016)).

39. A director may not engage in transactions with the corporation in which the director has a direct or indirect interest except under very limited circumstances. G.S. § 55-8-31. In *Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E.2d 551 (1983), the North Carolina Supreme Court held it is a breach of fiduciary duty for an officer or director to usurp a corporate opportunity.

> The doctrine of corporate opportunity is a species of the duty of a fiduciary to act with undivided loyalty; it is one of the manifestations of the general rule that demands of an officer or director the utmost good faith in his relations with the corporation that he represents; in general, a

corporate officer or director is under a fiduciary obligation not to divert a corporate business opportunity for his own personal gain. In other words, the corporate opportunity doctrine provides that a corporate fiduciary may not appropriate to himself an opportunity that rightfully belongs to his corporation.

*Id*. at 307–08, 307 S.E.2d at 568 (quotation marks omitted).

40.     When there is a transaction between a corporation and its officers and directors, the adversely interested party must demonstrate that the transaction at issue was "just and reasonable" because it was not an opportunity that the corporation would have wanted. *Id*. at 310, 307 S.E.2d at 569. Factors to be weighed in determining whether a corporate opportunity has been usurped include: "1) [T]he ability, financial or otherwise, of the corporation to take advantage of the opportunity; 2) whether the corporation engaged in prior negotiations for the opportunity; 3) whether the corporate director or officer was made aware of the opportunity by virtue of his or her fiduciary position; 4) whether the existence of the opportunity was disclosed to the corporation; 5) whether the corporation rejected the opportunity; and 6) whether the corporate facilities were used to acquire the opportunity." *Id*. (citation omitted); *see also Boyd v. Howard*, 147 N.C. App. 491, 494–95, 556 S.E.2d 337, 339 (2001).

41.     "Under the general rule, the relation of employer and employee is not one of those regarded as confidential." *Dalton*, 353 N.C. at 652, 548 S.E.2d at 708 (internal quotations omitted). In some limited circumstances, however, an employee of a corporation acting as an agent of the corporation may owe fiduciary duties of loyalty and good faith to the corporation "concerning the matters within the scope of

his agency." *Sara Lee Corp. v. Carter*, 129 N.C. App. 464, 470, 500 S.E.2d 732, 736 (1998), *rev'd on other grounds*, 351 N.C. 27, 519 S.E.2d 308 (1999) (finding that defendant-employee who had responsibility to purchase computer parts as agent for the plaintiff-corporation "owed [the corporation] a fiduciary duty in carrying out these responsibilities").

42.     GTA alleges that Timothy, Steven, and Ryan breached their duties to GTA by, among other conduct: usurping a corporate opportunity for their own personal gain that should have been offered to GTA by creating GFY and Dolven to engage in cut-and-sew operations and manage supply chain logistics for GTA's customers; failing to disclose to Tack their ownership interests and personal financial stakes in GFY and Dolven; and diverting corporate opportunities and business to GFY and Dolven that should have been given to GTA. (ECF No. 4 at ¶ 109.) Since GTA does not allege that Garrett was an owner of GFY or Dolven, GTA's allegations regarding Garrett's breach of fiduciary duty appear to be limited to "failing to disclose the ownership of Dolven and [GFY]" to GTA. (*Id.*)

43.     As officers and directors, Timothy and Steven owed fiduciary duties to GTA. There is no dispute that they were involved in the creation, and possibly ownership of, GFY and are owners of Dolven. Timothy and Steven did not advise Tack about the opportunity to create GFY. Defendants contend that GTA was not interested in engaging in cut-and-sew operations in China and would not have been interested in the opportunity presented by the formation of GFY. (ECF No. 65.1 at ¶¶ 20–21; ECF No. 60.1 at ¶ 16.) In addition, the evidence at this stage shows that

GTA's primary business in China was sourcing fabric. (ECF No. 7 at pp. 4–6.) Nevertheless, it is undisputed that Ryan's responsibilities as head of GTA's China operations required him to identify qualified cut and sew vendors for at least some of GTA's customers, and to handle certain in-country logistics and supply chain issues for GTA's customers when they used Chinese vendors. Therefore, Ryan found the opportunity to create GFY through his position with GTA. *Meiselman*, 309 N.C. at 310, 307 S.E.2d at 569. In addition, GTA had the financial ability to take advantage of the opportunity. *Id.* Finally, while GTA has not presented specific evidence of any of its particular assets that were used to form GFY, there can be no doubt that GFY, and later Dolven, were created at a time that Timothy, Steven, and Ryan should have been devoting their efforts to GTA's interests.

44. The Court concludes that GTA has established, at this stage, that the opportunity to create a stand-alone, complementary business responsible for overseeing cut-and-sew operations and managing supply chain logistics for GTA's customers is one in which GTA would have been interested and which should have been presented to Tack.

45. The evidence at this stage also shows that after the formation of GFY and Dolven, Timothy and Steven, on behalf of GTA, engaged in numerous business transactions with GFY and Dolven in which they had direct or indirect financial interests. Timothy and Steven benefited financially from the transactions between GTA and GFY and Dolven. Finally, Timothy and Steven did not disclose their financial interests in GFY or Dolven to Tack until April 2015. Accordingly, the Court

concludes that at this stage of the litigation, GTA has established that it is likely to succeed on the merits of its claim of breach of fiduciary duty against Timothy and Steven.

46. The Court also concludes that the evidence is sufficient to establish that Ryan was not simply a run-of-the-mill employee of GTA, but rather held a unique position as the head of GTA's China operations. Ryan was directly responsible for transacting business on behalf of GTA with Chinese suppliers and vendors, as well as interacting with, and sometimes acting on behalf of, GTA's customers. After Ryan formed GFY and Dolven, he then transacted business on behalf of GFY and Dolven with GTA. Tack did not know of Ryan's involvement or financial interest in GFY or Dolven. The Court concludes that GTA has established a likelihood of success on its claim for breach of fiduciary duty against Ryan at this stage of the case. *See Sara Lee Corp.*, 129 N.C. App. at 470, 500 S.E.2d at 736.

47. By contrast, although Garrett succeeded Ryan in his role as head of China operations and likely owed GTA a fiduciary duty in that capacity, there is no evidence that Garrett breached any fiduciary duty owed to GTA. Garrett is not a shareholder and has no interest in either GFY or Dolven. (Br. Garrett Graven Opp'n P.'s Mot. Prelim. Inj., ECF No. 51 at p. 2; Garrett Graven Aff., ECF No. 51.1 at ¶ 29.) GTA contends that Garrett's knowledge of GFY and Dolven's ownership, and his failure to tell Tack about those matters, constitutes a breach of a fiduciary duty. GTA, however, has not put forward any evidence of self-dealing by Garrett, and Garrett has alleged in his sworn affidavit that he did not receive any personal benefit

from any of the corporate defendants. (ECF No. 51.1 at ¶ 29.) The Court concludes that GTA has failed to provide evidence that would establish a likelihood of success on its claim against Garrett for breach of fiduciary duty.

*ii. Misappropriation of Trade Secrets*

48.     GTA alleges that Timothy, Ryan, Dolven, GFY, and TDI (the "trade secret defendants") have misappropriated GTA's trade secrets in violation of the North Carolina Trade Secrets Protection Act ("NCTSPA"). (ECF No. 4 at ¶¶ 104–05.) GTA contends that its trade secrets consist of the following: research and development "concerning composition and use of fabrics, coatings, manufacturing techniques and processes, and color composition and quality control, product sampling"; fabric samples; fabric designs and patterns; the identities of GTA's customers and their needs; and the identities of the Chinese Mills that GTA has determined meet the standards for manufacturing fabrics for its customers. (ECF No. 7 at pp. 3–5.)

49.     Under the NCTSPA, a trade secret is defined as:

> [B]usiness or technical information . . . that: (a) [d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and (b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

G.S. § 66-152(3). In determining whether information constitutes a trade secret, courts consider: "(1) [t]he extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business;

(3) the extent of measures taken to guard secrecy of the information; (4) the value of information to business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others." *Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc.*, 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997).

50.     A plaintiff must identify trade secrets with sufficient particularity so that the court can determine whether misappropriation has occurred or will occur. *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 510–11, 606 S.E.2d 359, 364 (2004).

51.     The NCTSPA defines "misappropriation" as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." G.S. § 66-152(1). Misappropriation occurs when the defendant "[k]nows or should have known of the trade secret; and . . . [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." G.S. § 66-155.

52.     The Court has thoroughly reviewed the allegations and evidence presented by the parties and concludes that GTA has failed to establish a likelihood of success on its claim for misappropriation of trade secrets. The evidence does not support the claims that GTA's fabric designs and patterns are trade secrets. Rather, the designs and patterns are made available to GTA's potential customers and

Chinese manufacturers, and there are no efforts to maintain the confidentiality of GTA's fabric designs and patterns. (ECF No. 65.1 at ¶¶ 27–31; ECF No. 51.1 at ¶ 37.)

53.     The fabric sample books that GTA claims TDI copied cannot constitute trade secrets. Trade secrets must be subject to reasonable efforts to maintain their secrecy, meaning that publicly available information cannot constitute a trade secret. G.S. § 66-152(3)(b); *see also Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 370, 555 S.E.2d 634, 640 (2001). GTA's fabric sample books are made publicly available at trade shows. (ECF No. 65.1 at ¶ 31.) Furthermore, fabric sample books of the type used by GTA and by TDI are common in the industry. (ECF No. 65.1 at ¶¶ 29–30.) GTA never attempted to keep its fabric sample books confidential or a secret, and accordingly, the fabric sample books cannot be considered a trade secret.

54.     GTA contends that Timothy and TDI are using information "concerning construction, fabric, costs, raw materials and even customers" that Timothy learned while working for GTA. (ECF No. 83 at p. 10.) GTA's evidence in support of this contention consists solely of Gregory Tack's statement that during visits to three of GTA's customers, he saw TDI fabric sample books that contained "samples of upholstery fabric which are similar in appearance and color to upholstery fabrics" sold by GTA. (G. Tack Aff., ECF No. 10 at ¶ 5.) Timothy, however, has provided affidavit evidence that TDI has not used GTA's trade secrets and is purchasing fabrics from suppliers that are not GTA vendors. (ECF No 65.1 at ¶¶ 61–67.) Timothy claims that the TDI sample books were a Chinese manufacturer's books with TDI's logo placed on them, and that the fabrics were not copied from GTA's sample books. (ECF

No. 65.1 at ¶¶ 69–70.) In light of the evidence in the record that the types of upholstery fabrics GTA produces are commonly made by multiple manufacturers, Gregory Tack's affidavit testimony is not sufficient to support a likelihood of success on GTA's claim of misappropriation.

55. Finally, at this stage of the case, GTA has not established that the identities of its customers are trade secrets. To the contrary, the evidence establishes that GTA's customers are among the largest and best known bedding companies in the world, well known to the consuming public. (ECF No. 60.1 at ¶ 47; ECF 51.1 at ¶ 34.) The Court concludes that the identities of GTA's customers are not trade secrets within the meaning of the NCTSPA.

56. The evidence also supports the trade secret defendants' contention that Chinese fabric mills are relatively easily identified and are not trade secrets. (ECF No. 61.1 at ¶ 38; ECF No. 65.1 at ¶ 32; ECF No. 51.1 at ¶ 35.) GTA contends that it is the trade secret defendants' knowledge about particular manufacturers' capabilities, learned by Timothy and Ryan through their employment with GTA, that makes the identity of those manufacturers trade secrets. The Court disagrees. Generally, information retained in the memory of a departing employee is not a trade secret. *Bldg. Ctr., Inc. v. Carter Lumber of the North, Inc.*, 2017 NCBC LEXIS 85, at *20–21 (N.C. Super. Ct. Sept. 21, 2017) (citing *Kadis v. Britt*, 224 N.C. 154, 162, 20 S.E.2d 543, 547–48 (1944)). GTA does not allege that Timothy or Ryan took documents or electronically stored data regarding GTA's manufacturing vendors. The

only information they could have taken was in their respective memories and the Court concludes this information was not a trade secret.

57.    Accordingly, GTA has not established a likelihood of success on their claim for misappropriation of trade secrets in violation of the NCTSPA.

*D. Irreparable Harm*

58.    Since GTA has shown a likelihood of success on the merits of its claims for breach of fiduciary duty against Defendants Timothy, Steven, and Ryan, the Court must next consider whether GTA "is likely to sustain irreparable loss unless the injunction is issued, or . . . issuance is necessary for the protection of a [GTA]'s rights during the course of litigation." *Providence Volunteer Fire Dep't v. Town of Weddington*, 800 S.E.2d 425, 435, 2017 N.C. App. LEXIS 278, at *24 (2017) (citing *Ridge Cmty. Investors, Inc. v. Berry*, 293 N.C. 688, 701, 239 S.E.2d 566, 574 (1977)). GTA seeks an order from this Court requiring Dolven, GFY, and TDI to cease operations and prohibiting Timothy, Steven, and Ryan from doing business with or having any contact with GTA's customers and vendors. GTA also requests an injunction prohibiting Dolven, GFY, and TDI from selling, transferring, encumbering, or otherwise disposing of any assets during the course of this lawsuit.

59.    Generally, the extraordinary remedy of "[a] prohibitory preliminary injunction is granted only when irreparable injury is real and *immediate*." *United Tel. Co. v. Universal Plastics, Inc.*, 287 N.C. 232, 235, 214 S.E.2d 49, 51 (1975) (emphasis added). "[A]n injunction will not be granted where there is a full, adequate and

complete remedy at law." *Providence Volunteer Fire Dep't*, 800 S.E.2d at 435, 2017 N.C. App. LEXIS 278 at \*24.

60.     One significant measure of the need for immediate and irreparable harm is the haste with which the moving party seeks injunctive relief. *See N. Iredell Neighbors for Rural Life v. Iredell Cty.*, 196 N.C. App. 68, 79, 674 S.E.2d 436, 443 (2009) (affirming trial court's finding of no irreparable harm where "some two months elapsed without any contention by plaintiffs of an urgent threat of irreparable harm and after having reviewed the standards set forth in both the federal and North Carolina cases"); *Am. Air Filter Co. v. Price*, 2017 NCBC LEXIS 9, at \*13–14 (N.C. Super. Ct. Feb. 3, 2017) (denying a preliminary injunction after a delay of four months); *Southtech Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 410, 420 (E.D.N.C. 2006) ("[T]he six to nine week delay between plaintiff's discovery of defendant's competitive activities and its filing suit weighs against injunctive relief."); *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) ("Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction."); *John Lemmon Films, Inc. v. Atl. Releasing Corp.*, 617 F. Supp. 992, 996 (W.D.N.C. 1985) ("Perhaps even more telling of the absence of convincing proof that the Plaintiff would suffer irreparable harm is the Plaintiff's delay in seeking an injunction."); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiff's rights.

Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.").

61. GTA has failed to show that it will sustain irreparable harm without the issuance of a preliminary injunction. Most significantly, GTA's remarkably lengthy delay in filing suit and seeking an injunction after learning of Defendants' conduct weighs heavily against its claim that it is likely to suffer irreparable harm. GTA first learned of Timothy, Steven, and Ryan's ownership interest in Dolven in April, 2015. It investigated Dolven, and in April, 2016, GTA notified Timothy and Steven that GTA had legal claims against them arising from the creation and operation of GFY and Dolven. GTA, however, did not file suit until August 15, 2017, almost sixteen months later, and did not move for a preliminary injunction until September 1, 2017. GTA's delay completely undermines its claims that it will suffer immediate and irreparable harm if this Court does not issue a preliminary injunction. *Galaton v. Johnson*, No. 5:11-CV-397-D, 2011 U.S. Dist. LEXIS 92125, at *8 (E.D.N.C. 2011) (citing *Quince*, 872 F.2d at 79–80) (denying preliminary injunction where the "[plaintiff] has been aware of the facts forming the basis of his claims for months, yet waited until the fifty-ninth minute of the eleventh hour to seek an extraordinary equitable remedy").

62. In addition, the Court concludes that GTA's claims are capable of redress through an award of money damages. *A.E.P. Indus., Inc. v. McClure*, 58 N.C. App. 155, 156, 293 S.E.2d 232, 233 (1982), *rev'd on other grounds*, 308 N.C. 393, 302 S.E.2d 754 (1983) ("An injunction ordinarily will not be granted where there is an

adequate legal remedy which is as practical and efficient as is the equitable remedy.").

63.     While a court can also grant a preliminary injunction to protect a plaintiff's rights during the litigation, *Providence Volunteer Fire Dep't*, 800 S.E.2d at 435, 2017 N.C. App. LEXIS 278 at *24, GTA has failed to identify any rights that requires protection at this time in the form of a preliminary injunction. The only "right" or interest that GTA might have to protect is its ability to recover money damages by preserving Defendants' assets. GTA, however, does not contend that Defendants are transferring, hiding, or otherwise dissipating assets to keep them from GTA's reach should it prevail in this lawsuit. In that sense, this case is no different than any other civil action in which a party that may prevail on a claim might want to prevent the defendant from transferring assets. Simply preserving assets for the purposes of potentially satisfying a judgment is not the type of relief that warrants such extraordinary equitable relief as a preliminary injunction.

64.     Finally, after a "careful balancing of the equities," *A.E.P. Indus., Inc.*, 308 N.C. at 400, 302 S.E.2d at 759, the Court cannot conclude that a preliminary injunction is appropriate here. GTA's request to prohibit Dolven, GFY, and TDI from conducting business would put Timothy and Ryan, as well as their current employees, out of work and probably would be damaging to GTA's interests in recovering monetary damages in this case. The evidence before the Court at this time indicates that Dolven and GFY are successful, ongoing businesses. To shut down these companies, or restrict their respective abilities to use their assets as needed to remain

profitable, would potentially put in jeopardy GTA's ability to be made whole in the event it prevails on its claims. *See Huskins v. Yancey Hosp., Inc.*, 238 N.C. 357, 360–61, 78 S.E.2d 116, 120 (1953) (recognizing that the court must consider "whether the granting of an interlocutory injunction would work greater injury to the defendant than is reasonably necessary for the protection of the plaintiff" and that "an interlocutory injunction should be refused when its issuance would cause great injury to the defendant and confer little benefit in comparison upon the plaintiff").

65.     The Court concludes, in its discretion, that the Motion for Preliminary Injunction should be DENIED.

THEREFORE, IT IS ORDERED that:

66.     Defendants' Motion to Strike is GRANTED in part, and DENIED in part.

67.     GTA's Motion for Preliminary Injunction is DENIED.

This the 21st day of November, 2017.


/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
   for Complex Business Cases